## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TROPICANA ENTERTAINMENT, LLC, *et al.*,[1] | ) | Case No. 08-10856 (KJC) |
| | ) | |
| Reorganized Debtors. | ) | Jointly Administered |
| | ) | |
| LIGHTSWAY LITIGATION SERVICES, LLC, | ) | |
| as Trustee of Tropicana Litigation Trust, | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary No. 10-50289 (KJC) |
| | ) | |
| WILLIAM J. YUNG, III; WIMAR TAHOE | ) | |
| CORPORATION, f/k/a Tropicana Casinos and | ) | |
| Resorts, Inc.; and COLUMBIA SUSSEX | ) | |
| CORPORATION, | ) | |
| Defendants | ) | |

## MEMORANDUM

## BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

## BACKGROUND

On May 5, 2008, Tropicana Entertainment, LLC ("Tropicana") and several related

entities (the "Debtors") filed voluntary chapter 11 bankruptcy petitions in this Court. The

Debtors were affiliated hotels and casinos located in Nevada, Mississippi, New Jersey, Indiana

---

[1]The chapter 11 cases for the following debtors have been jointly administered: Adamar Garage Corporation; Adamar of Nevada Corporation; Argosy of Louisiana, Inc.; Atlantic-Deauville, Inc.; Aztar Corporation; Aztar Development Corporation; Aztar Indiana Gaming Company, LLC; Aztar Indiana Gaming Corporation; Aztar Missouri Gaming Corporation; Aztar Riverboat Holding Company, LLC; Catfish Queen Partnership in Commendam; Centroplex Centre Convention Hotel, L.L.C.; Columbia Properties Laughlin, LLC; Columbia Properties Tahoe, LLC; Columbia Properties Vicksburg, LLC; CP Baton Rouge Casino, LLC; CP Laughlin Realty, LLC; Hotel Ramada of Nevada Corporation; Jazz Enterprises, Inc.; JMBS Casino LLC; Ramada New Jersey Holdings Corporation; Ramada New Jersey, Inc.; St. Louis Riverboat Entertainment, Inc.; Tahoe Horizon, LLC; Tropicana Development Company, LLC; Tropicana Enterprises; Tropicana Entertainment Holdings, LLC; Tropicana Entertainment Intermediate Holdings, LLC; Tropicana Express, Inc.; Tropicana Finance Corp; Tropicana Las Vegas Holdings, LLC; Tropicana Las Vegas Resort and Casino, LLC; and Tropicana Real Estate Company, LLC (collectively, the "Debtors").

and Louisiana.  On May 6, 2008, an ad hoc consortium of senior subordinated noteholders filed

an emergency motion for appointment of chapter 11 trustee to replace William J. Yung, III

("Yung"), who was the director, chief executive, and 100% owner of all equity securities of

Tropicana Casino and Resorts, Inc., the Debtors' ultimate parent company [2] (the "Chapter 11

Trustee Motion") (Main Case D.I. 37). The Official Committee of Unsecured Creditors filed a

limited joinder to the Chapter 11 Trustee Motion (Main Case D.I. 289).  On July 2, 2008, the

Court entered an Order approving the parties' resolution of the Chapter 11 Trustee Motion

which, *inter alia*, provided for Yung's resignation from the board of Debtor Tropicana

Entertainment Holdings, LLC, and its direct and indirect Debtor subsidiaries, and all other

Debtors (Main Case D.I. 485).

     In March 2009, Wimar Tahoe Corporation[3] ("Wimar") and Columbia Sussex Corporation

("Columbia"), two entities that are controlled by Yung, filed motions for allowance and

immediate payment of administrative expense claims against the Debtors (Main Case D.I.'s

1782, 1784).  Objections to Wimar's and Columbia's administrative expense claims were filed

by The Official Committee of Unsecured Creditors (the "Creditors Committee") (Main Case D.I.

1924) and the Steering Committee of Senior Secured Lenders (Main Case D.I. 1939).[4]

     On May 5, 2009, the Court entered Orders (Main Case D.I.'s 2001, 2002) confirming the

*First Amended Joint Plan of Reorganization of Tropicana Entertainment, LLC and Certain of its*

*Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "OpCo Plan") and the *First*

---

[2] In 1990, Yung incorporated Wimar Tahoe Corporation ("Wimar"), which was later renamed Tropicana Casinos and Resorts, Inc. ("TCR"). After the Debtors filed bankruptcy, TCR changed its name back to Wimar. (Am. Compl. p. 8, n. 4).  The Amended Complaint refers to Wimar, TCR, or just "Tropicana" interchangeably.  I will use the company's current name "Wimar."

[3] *See* n. 2, *supra.*

[4] On August 4, 2010, Wimar and Columbia filed motions for summary judgment on their motions for payment of administrative expense claims (Main Case D.I.'s 3020, 3022), which are pending.

*Amended Joint Plan of Reorganization of Tropicana Las Vegas Holdings, LLC and Certain of its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "LandCo Plan" and, together with the OpCo Plan, the "Plans"). The Plans created a Litigation Trust to pursue certain "Insider Causes of Action" for the benefit of certain classes of unsecured creditors.[5] Lightsway Litigation Services, LLC was appointed as the trustee of the Litigation Trust (the "Trustee").

On February 17, 2010, the Trustee filed a complaint against Yung, Wimar, Columbia and others asserting claims for breach of fiduciary obligations, breach of contract, breach of the implied covenant of fair dealing, and equitable subordination. The defendants filed a motion to dismiss the complaint and, after a hearing, the Court entered an Order denying the motions to dismiss, but directing the Trustee to file an amended complaint. (Adv.D.I. 37.) On February 9, 2011, the Trustee filed the First Amended Complaint (the "Amended Complaint") (Adv. D.I. 44) against Yung, Wimar and Columbia (the "Defendants"). The Amended Complaint asserts five claims: (i) breach of fiduciary obligations; (ii) aiding and abetting breach of fiduciary obligations; (iii) breach of contract; (iv) breach of the covenant of good faith and fair dealing; and (v) equitable subordination.

---

[5] *See* Article IV.B.5 of the OpCo Plan and Article IV.G of the LandCo Plan. The Plans defined "Insiders Causes of Action" as meaning all "(a) Claims, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises; (b) all rights of setoff, counterclaim, or recoupment and Claims on contracts or for breaches of duties imposed by law; (c) rights to object to Insider Claims or Yung Interests; (d) Claims pursuant to sections 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code; and (e ) Claims and defenses of fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, including through the Effective Date, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, that can or may be asserted against one or more of the Yung Entities or in respect of the Insider Claims or the Yung Interests." *See* Plans, Article I.A.63.

The Defendants filed a motion to dismiss the Amended Complaint (the "Motion to Dismiss") (Adv. D.I. 59). The matter was fully briefed and oral argument was held. For the reasons stated herein, the Motion to Dismiss will be granted in part and denied in part.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 & 157(a). Bankruptcy judges are permitted to hear, determine and enter appropriate orders and judgments on core proceedings arising under title 11 or arising in a case under title 11. 28 U.S.C. §157(b)(1). A claim will "arise under" title 11 if "the Bankruptcy Code creates the cause of action or provides the substantive right invoked." *Stoe v. Flaherty*, 436 F.3d 209, 217 (3d Cir. 2006) quoting *Halper v. Halper*, 164 F.3d 830, 836-37 n.7 (3d Cir. 1999). The equitable subordination claim in the Amended Complaint is a core proceeding that "arises under" the Bankruptcy Code, specifically §510(c).

The remaining claims for breach of fiduciary obligations, aiding and abetting a breach of fiduciary obligations, breach of contract, and breach of the covenant of good faith and fair dealing are typically non-core proceedings that do not arise in or arise under title 11. However, Wimar and Columbia filed administrative and priority claims against the Debtor's estate. The Debtors and other creditors have objected to the allowance of those claims. The Trustee asserts that determination of the claims asserted in this adversary proceeding are necessary to a determination on the allowance of Defendants' claims. Therefore, the issues may be considered core pursuant to §157(b)(2)(B). *See Stern v. Marshall*, 564 U.S. ___, 131 S.Ct. 2594, 2617, 180 L.Ed. 2d 475 (2011) discussing and quoting *Lagenkam v. Culp,* 498 U.S. 42, 44-45, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) ("[The *Lagenkamp* Court explained] that a preferential transfer

claim can be heard in bankruptcy when the allegedly favored creditor has filed a claim, because *then* 'the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship.' . . . If, in contrast, the creditor has not filed a proof of claim, the trustee's preference action does *not* 'become[ ] part of the claims-allowance process' subject to resolution by the bankruptcy court.")

The claims fall within the confines of post-confirmation related-to jurisdiction. In *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 168-69 (3d Cir. 2004), the Third Circuit noted:

> [T]he jurisdiction of the non-Article III bankruptcy courts is limited after confirmation of a plan. But where there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate.

The Trustee was granted authority to pursue the Debtors' claims in this adversary proceeding through a litigation trust agreement established under the Plans. Further, the parties have consented to this Court's entering a final order on non-core matters. (Main D.I. 3596 at 35-36.) 28 U.S.C. §157(c)(2) (When all of the parties consent, a bankruptcy judge may hear a non-core proceeding that is related to a bankruptcy case and enter all appropriate orders and judgments, subject to review by the district court pursuant to 28 U.S.C. §158.)

The Bankruptcy Court also has the power to enter an order on a motion to dismiss even if the matter is non-core or it has no authority to enter a final order on the merits. *Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*, 2014 WL 1320145, *2 (Bankr.D.Del. Apr. 2, 2014) citing *In re Trinsum Grp., Inc.*, 467 B.R. 734, 739 (Bankr.S.D.N.Y.2012) ("After *Stern v. Marshall*, the ability of bankruptcy judges to enter interlocutory orders in proceedings . . . has

been reaffirmed . . . ."); *Boyd v. King Par, LLC,* Case No. 11–CV–1106, 2011 WL 5509873, at

*5 (W.D.Mich. Nov. 10, 2011) ("[U]ncertainty regarding the bankruptcy court's ability to enter a

final judgment . . . does not deprive the bankruptcy court of the power to entertain all pretrial

proceedings, including summary judgment motions."). [6]

## FACTUAL ALLEGATIONS

The Debtors were affiliated hotels and casinos wholly owned by parent company Wimar,

formerly known as Tropicana Casino and Resorts, Inc. ("TCR"). Wimar was solely owned by

Yung, who was the sole director and chief operating officer of Wimar. (Am. Compl. ¶17.) Yung

was the sole director of fifteen Debtors,[7] the sole manager of two Debtors,[8] and the chief

executive officer of the sole manager or the sole member of fifteen other Debtors.[9] (*Id.*)

Yung founded Columbia in 1972 and eventually "amassed a portfolio of more than 70

hotels." (Am. Compl. ¶ 21.) In 1990, Yung created Wimar to purchase, develop and operate a

number of casino properties. (Am. Compl. ¶22.) In May 2006, Wimar entered into an agreement

---

[6] If it is later determined that a final order or judgment by this Court in this matter is not consistent with Article III of the United States Constitution, then this Memorandum and Order are submitted as proposed findings of fact and conclusions of law for the District Court to consider in accordance with the District Court's Amended Standing Order of Reference dated February 29, 2012.

[7] The Amended Complaint alleges that Yung was the sole director of Adamar Garage Corporation; Adamar of Nevada Corporation; Argosy of Louisiana, Inc.; Atlantic-Deauville, Inc.; Aztar Corporation; Aztar Development Corporation; Aztar Indiana Gaming Corporation; Aztar Missouri Gaming Corporation; Hotel Ramada of Nevada Corporation; Jazz Enterprises, Inc.; Ramada New Jersey Holdings Corporation; Ramada New Jersey, Inc.; St. Louis Riverboat Entertainment, Inc.; Tropicana Express, Inc.; and Tropicana Finance Corp.

[8] The Amended Complaint alleges that Yung was the sole manager of Columbia Properties Vicksburg, LLC and JMBS Casino LLC.

[9] The Amended Complaint alleges that Yung was the chief executive officer of the sole manager or sole member of Aztar Indiana Gaming Company, LLC; Aztar Riverboat Holdings Company, LLC; Centroplex Centre Convention Hotel LLC; Columbia Properties Laughlin, LLC; Columbia Properties Tahoe, LLC; CP Baton Rouge Casino, LLC; CP Laughlin Realty, LLC; Tahoe Horizon, LLC; Tropicana Development Company, LLC; Tropicana Entertainment Holdings, LLC; Tropicana Entertainment Intermediate Holdings, LLC; Tropicana Las Vegas Holdings, LLC; Tropicana Las Vegas Resort and Casino, LLC; Tropicana Entertainment LLC; and Tropicana Real Estate Company, LLC.

to acquire Aztar, Inc. ("Aztar"), which owned five casino properties: Tropicana Atlantic City; Tropicana Las Vegas; Casino Aztar Evansville in Indiana; the Tropicana Express Hotel and Casino in Laughlin, Nevada; and the Casino Aztar Caruthersville in Missouri. (Am. Compl. ¶24.) On January 3, 2007, Wimar acquired all of the outstanding stock of Aztar for approximately $2.1 billion in cash (the "Aztar Acquisition"). (*Id.*) In connection with the Aztar Acquisition, Yung publicly acknowledged that "we have limited experience operating a full-scale casino resort in the Atlantic City or Las Vegas markets," and "given its size, operating Aztar may strain our management resources and the integration of Aztar may divert the attention of our management team from other important business concerns." (Am. Compl. ¶26.)

a.    Tropicana Atlantic City[10]

During first month after the Aztar Acquisition, Tropicana Atlantic City reduced its overall workforce by 206 employees and, by the end of October 2007, Tropicana Atlantic City reduced its overall workforce by 897 employees, leaving only 80 percent of the pre-acquisition workforce on the premises. (Am. Comp. ¶39.) The reductions led to a "cleanliness crisis" that received "horrible" press coverage. (Am Comp. ¶¶ 41-42.)[11]    These cost-cutting measures were

---

[10] In April 2009, Adamar of New Jersey, Inc. and Manchester Mall, Inc. filed chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the District of New Jersey. (Am. Compl. n.3.) The Trustee alleges that Yung also controlled those debtors at the time of the conduct complained of in the Amended Complaint. (*Id.*) The Amended Complaint alleges that Manchester Mall, Inc. was the wholly-owned subsidiary of Adamar of New Jersey, Inc., which, in turn, was the wholly-owned subsidiary of Debtor Ramada New Jersey Holdings Corp., which, in turn, was the wholly-owned subsidiary of Debtor Aztar Corp. (*Id.*) The Amended Complaint alleges that Yung was the sole director of Debtors Ramada New Jersey Holding Corp. and Aztar Corp. (*Id.*)

[11] According to one article, several employees filed complaints "with the union alleging a lack of cleaning supplies such as brooms, disinfectant and soap for casino bathrooms . . . [E]mployees wrote they were tired of apologizing to customers that fruit served to guests for drinks contained flies, and plastic cups, bugs." Other articles referenced a host of problems, including bedbugs, roaches, overflowing toilets, bathrooms that smelled like urine, muddy bathroom floors, dirty slot machines, long waits for drinks and jackpot payouts, no mouthwash, towels or shampoo in hotel rooms, hotel rooms that had not been vacuumed, used coffee stirrers and paper on hotel room floors and significant amounts of dust on televisions and furniture in hotel rooms." (Am. Compl. ¶42.)

intended to maximize Yung's bottom line but "from the outset [were] completely unsuitable for the heavily regulated casino industry." (Am. Compl. ¶ 21.)

On October 30, 2007, New Jersey's Division of Gaming Enforcement (the "DGE") issued a report on the application of Adamar of New Jersey, Inc. [one of the New Jersey debtors] for renewal of its casino and casino hotel alcoholic beverage licenses for Tropicana Atlantic City (the "DGE Report"). (Am. Compl. ¶28.) The DGE Report noted, among other things, that (i) the DGE had filed a complaint on October 25, 2007 against Tropicana Atlantic City for failing to comply with minimum staffing requirements for security personnel; (ii) layoffs had affected service and cleanliness at Tropicana Atlantic City, ultimately resulting in a failure to maintain its status as a first class facility; and (iii) Tropicana Atlantic City failed to establish an independent audit committee as required by New Jersey law. (*Id.*) Nevertheless, the DGE recommended renewal of the licenses subject to twenty-six separate conditions. (*Id.*)

After eight days of hearings in November and December 2007, the New Jersey Casino Control Commission (the "CCC") entered a 63-page order dated December 12, 2007, which denied Tropicana Atlantic City's request for a casino gaming license. (Am. Compl. ¶29.) The denial was based on two main factors: (i) the failure to form a statutorily required independent audit committee, and (ii) the adverse effects of insufficient staffing. (Am. Compl. ¶30.) The CCC also imposed a civil penalty of $720,000 on Tropicana Atlantic City for failure to establish an independent audit committee. (Am. Compl. ¶36.)

The CCC also found that Yung "demonstrated a lack of financial integrity" and that "Yung and his cohorts made personal equity investments that were mischaracterized as loans to avoid additional regulatory scrutiny." (Am. Compl. ¶30.) The CCC stated that "obtain[ing] the resignation of Yung as the sole member of Tropicana's board of directors" was the "first order of

business" following denial of the license. (Am. Compl. ¶45.) However, Yung refused to cede

control of the Debtors, which further escalated the losses and damages. (Am. Compl. ¶46.)

Yung appealed, but on July 1, 2008, the New Jersey Superior Court, Appellate Division,

affirmed the CCC Order. (Am. Compl. ¶47.) Yung also lost his subsequent appeal to the

Supreme Court of New Jersey. (Am. Compl. ¶48.)

The denial of Tropicana Atlantic City's gaming license "triggered a series of cascading

events that led directly to the filing of these Chapter 11 Cases." (Am. Compl. ¶27.)

b.    Casino Aztar Evansville

As part of the Aztar Acquisition, Wimar also acquired the Casino Aztar Evansville

("Casino Aztar"), a riverboat casino featuring two hotels in Evansville, Indiana. (Am. Compl.

¶50.) After employee lay-offs at Casino Aztar, the mayor of Evansville wrote to the Executive

Director of the Indiana Gaming Commission (the "IGC"), asking the IGC to investigate whether

(i) Yung reneged on his promise to avoid massive employee layoffs, and (ii) whether Columbia's

business model would produce successful results for the city or state. (Am. Comp. ¶¶ 50-51.)

Casino Aztar agreed to pay a fine of $125,000 to resolve fourteen incidents raised by the IGC as

a result of the investigation undertaken at the mayor's request. (Am. Compl. ¶54.) Casino

Aztar's gaming license was set to expire at the end of March 2008, and IGC's ongoing

investigation and the denial of the New Jersey license (which, under Indiana gaming law can

serve as an automatic basis for denial of a license) threatened renewal. (Am. Compl. ¶55.) After

Wimar announced that it would seek to sell Casino Aztar, the IGC suspended further

investigation. (*Id.*) On March 31, 2008, Debtor Aztar Riverboat Holding Company , LLC

entered into a Securities Purchase Agreement to sell its membership interests in Casino Aztar to

Resorts Indiana, LLC and Eldorado Resorts, LLC. (Am. Compl. ¶56.) However, the Debtors

filed their chapter 11 petitions prior to closing of the sale. (Am. Compl. ¶57.)

c.      The Nevada Casino Properties

After the Aztar Acquisition in early 2007, Yung contemplated demolishing the Tropicana

Las Vegas property due to extensive maintenance issues. (Am. Compl. ¶59.) After reducing the

work force and halting marketing efforts, the timeline was changed and it was announced the Las

Vegas property would remain open, but the changes made successful operation nearly

impossible. (*Id.*) Employee terminations at the River Palms Casino in Lauglin, Nevada also had

a negative effect on operations. (Am. Compl. ¶62.)

d.      Other misconduct

Yung's entities often failed to make meaningful capital improvements to the various hotel

and casino properties. (Am. Compl. ¶63.) Employees reported problems with ceiling leaks,

broken pipes, holes in walls, stains on carpets and failing air-conditioning, as well as a general

failure to upgrade décor and gaming elements, such as slot machines. (Am. Compl. ¶70.) In one

case, Yung's entities and Park Cattle Corporation ("Park"), lessor of the Tahoe Horizon property,

became embroiled in litigation over Columbia's failure to renovate and maintain the property.

(Am. Compl. ¶¶63-65.) Among other things, Park alleged that the property suffered physical

damage, including "water damage of the exterior wall components and mold growth within the

exterior walls of the Hotel Property" which "caused degraded indoor air quality, which presents

potential unreasonable health risks to the staff and guests occupying the Hotel Property." (Am.

Compl. ¶66). After a seven-week trial, the parties settled with Yung and the Tropicana entities

agreeing to pay $165 million to Park, although Yung claimed in depositions that the claims were

meritless. (Am. Compl. ¶67.)

Yung instituted a "dual management and financial reporting" system at the hotel and casino properties, which created gross operational inefficiencies and animosity among the competing hotel and casino operations and, in the end, negatively affected the casino and hotel guests. (Am. Compl. ¶72.) The separate accounting functions that were maintained eventually pitted the "two sides of the same house" against each other. (Am. Compl. ¶74.) For example, separate financial reporting caused the hotels to increase rates to appear more profitable and, while the hotel would honor lower rates for casino customers, the hotel billed the casino for the difference in price. (Am. Compl. ¶78.)

Other problems were caused when Yung centralized all of the Aztar properties' payroll, accounts payable, accounting, and human resources functions (except Atlantic City) through Columbia's headquarters in Kentucky. (Am. Compl. ¶¶ 82-83). Prior to the Aztar Acquisition, each property handled these matters at the property level. (*Id.*) Columbia's accounts payable system was ill-equipped to handle the massive inflow of invoices from the new casinos, causing operational disruptions. (Am. Compl. ¶85.) Columbia also was not prepared to handle the additional payroll duties, resulting in employees not being paid timely, taxes incorrectly applied to paychecks, and errors in the amount of pay, which in turn led to two labor grievances filed against Columbia. (Am. Compl. ¶87.) Problems also arose in tracking employee vacation time and by causing significant cost increases and interruptions in coverage in employee health insurance. (Am. Compl. ¶¶ 92-94.)

"In sum, Yung's repeated and myriad reckless acts of mismanagement, so egregious as to constitute disloyalty and bad faith, led to the loss of hundreds of millions of dollars of equity in the Debtors." (Am. Compl. ¶96.)

**STANDARD OF REVIEW**

Fed.R.Civ.P. 12(b)(6), made applicable by Fed.R.Bankr.P. 7012(b), governs a motion to dismiss for failing to state a claim upon which relief can be granted. "The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case." *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F.Supp. 2d 404, 407 (D.Del. 2007) citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). When reviewing a motion to dismiss, the Court will construe the complaint "in the light most favorable to the plaintiff." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011) quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations omitted).

The Third Circuit Court of Appeals has outlined a three-step process to determine the sufficiency of a complaint under *Twombly* and *Iqbal*:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago [v. Warminster*

*Twp.*, 629 F.3d [121] at 130 [3d Cir. 2010] (quoting *Iqbal,* 129 S.Ct. at 1947, 1950); *see also Great Western Mining & Min. Co. v. Rothschild LLP*, 615 F.3d 159, 177 (3d Cir.2010).

*Burtch*, 662 F.3d at 221.

The relevant record under consideration consists of the complaint and any "document integral or explicitly relied on in the complaint." *U.S. Express Lines, Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir. 2002), citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997). When considering a motion to dismiss, "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Commonwealth of Pa., ex real. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 181 (3d Cir. 1988), quoting *Car Carriers v. Ford Motor Co.,* 745 F.2d 1101,1107 (7th Cir. 1984) *cert denied* 470 U.S. 1054 (1984). The movant carries the burden of demonstrating that dismissal is appropriate. *Intel Corp.*, 496 F.Supp.2d at 408.

## DISCUSSION

The Trustee's Amended Complaint contains five counts: (1) breach of the fiduciary duties of loyalty, good faith and due care against Yung; (2) aiding and abetting Yung's breach of fiduciary duties against Columbia and Wimar; (3) breach of contract against Columbia and Wimar; (4) breach of implied covenant of good faith and fair dealing against Columbia and Wimar; and (5) equitable subordination against all the Defendants. The Defendants move to dismiss all counts.

A.    Choice of Law

Before this Court can evaluate the merits of claims that are based on state law, I must first determine which state's laws should be applied. Allegations in the Amended Complaint involve Debtors incorporated in various states and actions related to hotels and casinos located in

numerous jurisdictions, including without limitation, Delaware, Indiana, Nevada, Louisiana, Missouri and New Jersey.

The Defendants argue that the Amended Complaint is deficient because the Trustee fails to specify which state's laws apply to each claim. The Trustee resists this argument by asserting that a complaint need only allege facts, not plead choice of law. At the hearing on the Defendants' motion to dismiss the original complaint, I directed the Trustee to include choice of law allegations for each count. (Main Case D.I. 3184 at 34-36.) The Amended Complaint, however, continues to refer broadly to all of the Debtors without distinction, asserting (i) breaches of fiduciary duty "under the law of each of the states in which Debtors were incorporated, to wit, principally Delaware, as that was . . . the State of incorporation of the vast majority of the Debtors and where the vast majority of the Debtors filed bankruptcy," (Am. Compl. ¶98); and (ii) breaches of contract "both in Delaware and Kentucky, as well as in the various states where the Casino Properties were located." (Am. Compl. ¶107.)

"The conflict of laws rules to be applied by the federal court[s] in Delaware must conform to those prevailing in Delaware's state courts." *Brooks v. Culbreath,* 2010 WL 376886, *3 (D.Del. Jan. 28, 2010) quoting *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). *See also Penna. Emp. Benefit Trust Fund v. Zeneca, Inc.,* 710 F.Supp.2d 458, 466 (D.Del. 2010) ("[A] district court must apply the forum state's choice of law rules.") Accordingly, Delaware's choice of law rules apply in this case.

Delaware's choice of law approach entails a two-pronged inquiry: (1) the laws of the competing jurisdictions are compared to determine whether the laws actually conflict on a relevant point; and (2) if an actual conflict exists, Delaware employs the "most significant relationship" test as set forth in the Restatement (Second) of Conflict of Laws to determine

which law should apply. *Zeneca,* 710 F.Supp.2d at 466-67. *See Travelers Indem. Co. v. Lake,* 594 A.2d 38, 47 (Del. 1991) (adopting the most significant relationship test).

Generally, the parties' arguments under each Count have focused on Delaware law.[12] Although courts are not bound by legal conclusions agreed to by the parties, "courts . . . may properly rely on the forum state's law where neither party asserts that another jurisdiction's law meaningfully differs." *Johnson v. Priceline.com, Inc.,* 711 F.3d 271, 276 n.2 (2d Cir. 2013). *See also Fednav Inter'l Ltd. v. Continental Ins. Co.,* 624 F.3d 834, 838 (7th Cir. 2010) ("When neither party raises a conflict of law issue . . . the applicable law is that of the state in which the federal court sits.") (citation omitted).  For claims requiring this Court to apply state law, I will look to the law of the state of Delaware, and will address whether other law is applicable only when a party specifically argues that another state's law applies and conflicts with that of Delaware.

B.    Breach of Fiduciary Duty (Count One) and Aiding and Abetting Breach of Fiduciary Duty (Count Two)

In Count One of the Amended Complaint, the Trustee alleges that Yung owed the Debtors fiduciary duties of loyalty, good faith and due care, and that his conduct, as described in detail in the Amended Complaint, violated those fiduciary duties.   In the Motion to Dismiss, the Defendants argue that the Trustee's claim for breach of fiduciary duty must be dismissed because: (i) the doctrine of *in pari delicto* prevents the Trustee from pursuing breach of fiduciary duty claims; and (ii) Yung did not owe any fiduciary duty to the Debtors and, even if a fiduciary duty existed, the Trustee lacks standing to pursue a breach of fiduciary duty claim on behalf of creditors.

---

[12] Both parties assert conflicts among the laws of Delaware and other jurisdictions with respect to the applicable statute of limitations for breach of fiduciary duty claims.  However, because I have determined that the breach of fiduciary duty claims will be dismissed, I need not address any conflicts among statutes of limitation.

1.    The doctrine of *in pari delicto*

The doctrine of *in pari delicto* provides a defense to a claim against a defendant if the plaintiff bears fault for the alleged injury. [13] *Official Comm. of Unsecured Creditors v. Lafferty & Co., Inc.,* 267 F.3d 340, 354 (3d Cir. 2001). *See also Zazzali v. Hirschler Fleischer, P.C.,* 482 B.R. 495, 512 (D.Del. 2012) ("Under the doctrine of *in pari delicto*, that plaintiff is barred from asserting a claim if the plaintiff participated in the wrongdoing that was a substantial cause of the alleged damages."); *In re American Int'l Group, Inc. v. Consol. Derivative Litig.,* 976 A.2d 872, 882 n. 19 (Del. Ch. 2009) ("*AIG*") quoting BLACK'S LAW DICTIONARY 1725 (8th ed. 1999) (noting that "[t]he phrase *in pari delicto* comes from the expression *in pari delicto potior est condition defendentis,* which means "[w]here both parties are equally in the wrong, the position of the defendant is the stronger.").

The Amended Complaint clearly alleges that Yung was an insider of the Debtors.  Courts have held that *in pari delicto* does not preclude claims against corporate insiders. *Lafferty,* 267 F.3d at 346; *AIG,* 976 A.2d at 876.  *See also Miller v. McCown De Leeuw & Co. (In re The Brown Schools),* 386 B.R. 37, 55-56 (Bankr.D.Del. 2008) (deciding that a Trustee's claims against a corporate insider are not barred by *in pari delicto*). Therefore, Yung cannot prevail on the equitable defense of *in pari delicto*.

---

[13] The Defendants argue that the Trustee does not have standing to assert a breach of fiduciary duty claim based on the doctrine of *in pari delicto*.  However, *in pari delicto* is an equitable defense, not a bar to standing. *Official Comm. of Unsecured Creditors v. Lafferty & Co., Inc.,* 267 F.3d 340, 346 (3d Cir. 2001) ("Whether a party has standing to bring claims and whether a party's claims are barred by an equitable defense are two separate questions.")  An equitable defense usually is not raised on a motion to dismiss, unless the defense is apparent on the face of the complaint. *See Ball v. Famiglio,* 726 F.3d 448, 459 n.16 (3d Cir. 2013) ("[W]e have acknowledged that a number of affirmative defenses that are not listed in Rule 12(b) could still be made by motion, provided the basis of the defense was apparent on the face of the complaint."). Consideration of *in pari delicto* is appropriate in this matter.

16

2.    <u>Breach of fiduciary duty claims</u>

The Amended Complaint alleges that Yung was the sole director or sole manager of certain Debtors, or the chief executive officer of the sole manager or sole member of other Debtors. The Amended Complaint also alleges that "Yung was at all pertinent times the sole director, chief operating officer, and the owner of 100% of the equity securities of defendant Wimar which was the Debtors' ultimate parent company." (Am. Compl. ¶17.) The Amended Complaint asserts that Yung owed fiduciary duties to the Debtors based upon his "equity ownership and control of the management, operation, and finances of the Debtors." (Am. Compl. ¶98.)

"The elements of a breach of fiduciary duty claim are (1) that the fiduciary duty exists and (2) that the fiduciary breached that duty." *York Lingings v. Roach*, No. 16622-NC, 1999 WL 608850. *2 (Del. Ch. July 28, 1999). For a fiduciary duty to exist, there must first be a fiduciary relationship. The Supreme Court of Delaware has determined that "it is well settled that directors owe fiduciary duties to the corporation . . ." *North American Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007). *See also Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009) (holding that corporate officers owe the same fiduciary duties of care and loyalty to the corporation as directors.); *Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC,* 2009 WL 1124451, *8 (Del. Ch. 2009) ("[I]n the absence of a contrary provision in the LLC agreement, the manager of an LLC owes the traditional fiduciary duties of loyalty and care to the members of the LLC.") The *Gheewalla* Court explained:

> When a corporation is *solvent*, those duties may be enforced by its shareholders, who have standing to bring *derivative* actions on behalf of the corporation because they are the ultimate beneficiaries of the corporation's growth and increased value. When a corporation is *insolvent*, however, its creditors take the place of the shareholders as the residual beneficiaries of any increase in value.

Consequently, the creditors of an *insolvent* corporation have standing to maintain derivative claims against the directors on behalf of the corporation for breaches of fiduciary duties. The corporation's insolvency "makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value."

*Gheewalla,* 930 A.2d at 101-02 (emphasis in original; citations omitted). The confirmed Plans transferred to the Litigation Trustee any right of the Debtors to pursue claims against insiders, including any derivative claims for breach of fiduciary duty.[14]

When a corporation is solvent, shareholders have the right to bring derivative actions on behalf of a corporation for a director's breach of fiduciary duties. *Gheewalla*, 930 A.2d at 101. The Amended Complaint alleges that the Debtors are wholly-owned subsidiaries of Wimar, which is owned entirely by Yung. Any fiduciary duties which Yung owed to the Debtors flowed to Wimar, the sole shareholder and parent of the Debtors. "[I]n a parent and wholly-owned subsidiary context, directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholder." *Trenwick America Litig. Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168, 200 (Del. Ch. 2006) quoting *Andarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del. 1988). The *Trenwick* Court further noted that Delaware law requires a subsidiary's directors to manage the subsidiary with loyalty to the parent, even if the directors' actions make the subsidiary less valuable. *Trenwick,* 906 A.2d at 201. This is so because wholly-owned subsidiaries are formed by parents for the benefit of the parents. *Id.*

---

[14] The Defendants also argue that the Trustee lacks standing to pursue creditors' *direct* claims for breach of fiduciary duty. Delaware Courts have clarified that, under Delaware law, creditors cannot pursue direct claims for breach of fiduciary duty. *Quadrant Structured Prod. Co., Ltd. v. Vertin,* 2014 WL 5099428, *10 (Del. Ch. Oct. 1, 2014) (deciding that, as a practical matter, directors *never* owe a fiduciary duties directly to creditors because (i) directors of solvent corporations do not owe any fiduciary duty to creditors, and (ii) the *Gheewalla* Court held that creditors of an insolvent corporation have no right to assert *direct* claims against corporate directors).

The Trustee argues that the Amended Complaint "alleges specific facts from which a fact-finder could reasonably conclude that Yung deliberately chose to prefer the financial health of his hotels to the financial harm of his casinos."[15] (Pl. Memo. at 10.) Even assuming (without deciding) that the facts in the Amended Complaint supported such an inference, those allegations are insufficient to support a plausible claim for breach of fiduciary duty. Under Delaware law, Yung was obligated to manage the *solvent* Debtor subsidiaries in the best interests of Wimar, the parent corporation, and - - ultimately - - himself, as the sole shareholder of Wimar.

This analysis completely changes, however, if the Amended Complaint alleges that the Debtors were *insolvent*. The creditors of an *insolvent* corporation have standing to maintain derivative claims on behalf of the corporation for breaches of fiduciary duties. *Gheewalla,* 930 A.2d at 101. *See also Claybrook v. Morris (In re Scott Acquisition Corp.),* 344 B.R. 283, 288 (Bankr.D.Del. 2006) ("There is no basis for the principle propounded by a few of the Defendants that directors of an insolvent subsidiary can, with impunity, permit it to be plundered for the benefit of its parent corporation."); *Production Resources Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 792 (Del. Ch. 2004) ("The firm's insolvency . . . makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value and logically gives them standing to pursue these claims to rectify that injury.") The Defendants argue, however, that the Amended Complaint does not allege that the Debtors were insolvent.

The solvency or insolvency of the corporation determines which constituency has the right to pursue a derivative claim based on a breach of fiduciary obligation. *Production Resources,* 863 A.2d at 792 ("[T]he fact that a firm has become insolvent *after* the acts that are alleged to have been fiduciarily improper does not convert a claim belonging to the corporation

---

[15] The Amended Complaint does not provide detail of which Debtors were casinos or which, if any, were hotels.

into one belonging to creditors . . . . The later fact of insolvency does not transform the nature of
the claim; it simply changes the class of those eligible to press the claim derivatively, by
expanding it to include creditors.") (emphasis in original).

Therefore, this plaintiff must allege either that a corporation was insolvent or became
insolvent as a result of the misconduct. *Trenwick*, 906 A.2d at 202 (deciding that a complaint
failed to plead facts supporting a rational inference that the corporation "was insolvent before
any of the challenged transactions or that any of the challenged transactions would, when
consummated, leave [the corporation] unable to satisfy its creditors.") Here, the Amended
Complaint alleges that "Yung's misconduct propelled the Debtors into insolvency, which
ultimately led to the filing of the bankruptcy cases in the Spring of 2008." (Am. Compl. ¶9.) *See
also* Am. Compl. ¶80 ("Yung's management model was grossly inefficient, created countless
problems throughout the properties, and inevitably led to financial collapse.")

However, the Amended Complaint's recitation of the words "insolvency" or "financial
collapse" - - without more - - is not enough to support a plausible claim of insolvency. The Court
should not accept conclusory statements. To meet the burden of pleading insolvency, a plaintiff
must plead facts showing that the debtor-corporation "has either 1) a deficiency of assets below
liabilities with no reasonable prospect that the business can be successfully continued in the fact
thereof, or 2) an inability to meet maturing obligations as they fall due in the ordinary course of
business." *Production Resources*, 863 A.2d at 782. The Amended Complaint contains details
regarding Yung's alleged mismanagement but, despite already allowing amendment to the
original complaint, the Trustee continues to plead overly broad or conclusory allegations. There
are no facts to provide a basis from which I can infer whether any or all of the Debtors were
insolvent or when insolvency occurred. In its brief, the Trustee argues that the Defendants did

not raise insolvency in their motion to dismiss the original complaint and, therefore, the Trustee seeks leave to file another amended complaint. The Trustee has now had ample opportunity to present a properly pled complaint.  The request for leave to again amend the complaint is denied.

For the foregoing reasons, the Trustee's claim against Yung for breach of fiduciary duty (Count One) will be dismissed.[16]  Without a claim for breach of fiduciary duty, the Trustee's claim against Wimar and Columbia for aiding and abetting Yung's breach of fiduciary duty (Count Two) will also be dismissed.

C.    Breach of Contract (Count Three)

In Count Three of the Amended Complaint, the Trustee alleges that Wimar and Columbia breached their obligations under contracts requiring Wimar and Columbia to provide management services for the Debtors. In their motion to dismiss the original complaint, the Defendants argued that the complaint failed to identify the contracts and the provisions within those contracts that had been breached.  The Court granted the Trustee the opportunity to amend the complaint, noting that the complaint needed to identify the contracts, the terms of the contracts and the breaches that are alleged under each contract.  (Main Case D.I. 3184 at 18.)

The Trustee attached copies of eight agreements to the Amended Complaint in which Wimar and Columbia agree to provide various management services with respect to approximately twelve Debtors (the "Identified Agreements"). [17]  The Trustee alleges that there

---

[16] The Trustee argues in its brief that New Jersey law may apply to the breach of fiduciary duty claim. However, the Trustee has not demonstrated that New Jersey law would conflict with Delaware law on this issue. *See VFB LLC v. Campbell Soup Co.,* 482 F.3d 624,635 (3d Cir. 2007) (determining, under New Jersey law, that a solvent wholly-owned subsidiary owes a duty of loyalty to its parent corporation, and that, upon insolvency, directors should manage the corporation in the interest of the creditors as well as that of the shareholders.)

[17] The Debtors mentioned in the attached contracts are: Adamar Garage Corp., Aztar Corp., Aztar Indiana Gaming Co., LLC, Columbia Properties Laughlin, LLC, Columbia Properties Tahoe, LLC, Columbia

are additional agreements that, like those attached to the Amended Complaint, contain a uniform provision stating "[Defendant] shall devote adequate time to provide management services [or accounting, tax and business services] as are necessary to fulfill the requirements of [Debtor]." In Count Three of the Amended Complaint, the Trustee alleges:

> Columbia and [Wimar] breached the Service Agreements by failing to provide quality and diligent management services, to wit, (a) failing to devote the "adequate time necessary" for the effective and diligent management of the Debtors' Casino properties (b) assisting and aiding and abetting Yung, as described in detail in this amended Complaint, in bringing financial ruin upon the Casino properties, and (c) pursuing Yung's personal interest, which, as detailed above, conflicted in numerous respects with the best interests of the Debtors' Casino properties.

(Am. Compl. ¶112.) The Defendants argue that Count Three of the Amended Complaint still fails to properly allege a breach of contract claim and should be dismissed.

Under Delaware law, the elements of a breach of contract claim are (i) a contractual obligation; (2) a breach of that obligation by the defendant; and (iii) a resulting damage to the plaintiffs. *Greenstar, LLC v. Heller*, 814 F.Supp.2d 444, 450 (D.Del. 2011).

The Identified Agreements provide information for eight contracts regarding twelve Debtors. While the Trustee alleges there are other contracts with other Debtors, the Amended Complaint fails to identify either the specific contracts or the specific Debtors who are parties to those contracts. The Amended Complaint did not describe the other contracts by, for example, identifying the date, parties or title of other agreements, along with a brief description of the contracts. The first requirement to support a breach of contract claim is met only as to the Identified Agreements.

As to the second requirement, the Trustee alleges that the Defendants failed to provide quality and diligent management services, including a breach of the specific provision to devote

Properties Vicksburg, LLC, CP Baton Rouge Casino, L.L.C., CP Laughlin Realty, LLC, Jazz Enterprises, Inc., Ramada New Jersey Holdings Corp., Tahoe Horizon, LLC, and Tropicana Entertainment, LLC.

"adequate time necessary" to fulfill their obligation.  Count Three incorporates by reference the factual allegations in the Amended Complaint regarding mismanagement by Yung and his entities, including:

- Allegations that the casinos were not managed pursuant to applicable regulations, which resulted in the loss of licenses and fines (*e.g.,* Am. Compl. ¶¶28 - 31, ¶54);

- Allegations regarding termination of numerous employees and elimination of casino hosts which caused a significant decline in business in Nevada casinos (Am. Compl. ¶¶60-62);

- Allegations regarding the failure to properly maintain casino properties (Am. Compl. ¶¶65-66, 70-71);

- Allegations regarding the myriad of problems caused by instituting a "dual management" system for the casinos and hotels (Am. Compl. ¶¶72 - 78); and

- Allegations regarding the problems caused by instituting a "poorly planned and hurriedly executed" centralized management system for the casinos, resulting in accounts payable issues (Am. Compl. ¶¶84-86) and employee payroll and benefit issues (Am. Compl. ¶¶ 87, 92 - 94).

The Amended Complaint also alleges that the mismanagement caused the financial collapse of loss of enterprise value of the Debtors. (Am. Compl. ¶¶49, 58, 80, 96).

Accepting the allegations in the Amended Complaint as true and viewing them in the light most favorable to the Trustee, which is required at this stage, I conclude that the Amended Complaint contains adequate allegations to support breach of contract claims that are plausible on their face. *Cf. Domiano v. Old Forge Bank (In re Domiano)*, 422 B.R. 497, 504 (Bankr. M.D. Pa. 2009) (dismissing an amended complaint for breach of contract for failing to identify the

contract or even summarize the essential terms). The breach of contract claims in Count Three with respect to the Identified Agreements will not be dismissed; however, any breach of contract claims based on contracts other than the Identified Agreements will be dismissed.

D.    Breach of Implied Covenant of Good Faith and Fair Dealing (Count Four)

In Count 4, the Trustee alleges that Wimar and Columbia breached the implied covenant of good faith and fair dealing which is incorporated in the service agreements with the Debtors. The Amended Complaint alleges that Columbia and Wimar were required "to take such action as was in the best interest of the diligent management of the Casino properties, regardless of whether such action was in the best interest of the Hotel properties or Yung personally." (Am. Compl. ¶119.) The Defendants seek dismissal of Count Four, arguing that the Trustee's claim for breach of the implied covenant of good faith and fair dealing simply restates the breach of contract claim.

Delaware courts have determined that "[t]he implied covenant of good faith and fair dealing inheres in every contract and requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (internal quotations and citations omitted). The *Kuroda* Court further explained:

> The implied covenant cannot be invoked to override the express terms of the contract. Moreover, rather than constituting a free floating duty imposed on a contracting party, the implied covenant can only be used conservatively to ensure the parties' reasonable expectations are fulfilled. Thus, to state a claim for breach of the implied covenant, [plaintiff] must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damages to the plaintiff. General allegations of bad faith conduct are not sufficient. Rather, the plaintiff must allege a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff the fruits of the contract.

> Consistent with its narrow purpose, the implied covenant is only rarely invoked successfully.

*Id.* (internal quotations and citations omitted). In the Amended Complaint, the Trustee alleges that Columbia and Wimar managed the Debtors in a way that unreasonably benefitted Yung's hotel properties to the detriment of the casino Debtors. The Amended Complaint contains several paragraphs alleging that the "dual management system" purposefully favored the operations of the hotels while destroying value of the casino Debtors. (Am. Compl. ¶¶72 - 80.) In other words, the Trustee alleges that Wimar and Columbia breached the covenant of good faith and fair dealing implied in the Identified Agreements when those entities unreasonably failed to manage the Debtors in accordance with the Debtors' best interests, thus denying them the fruits of the contract and resulting in damages. *See Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) ("We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected.")

Viewing the Amended Complaint's factual allegations in the light most favorable to the Trustee, which is required for the purpose of deciding the Motion to Dismiss, I conclude that Count Four should not be dismissed with respect to the Identified Agreements.

E.    Equitable Subordination (Count Five)

Count Five of the Amended Complaint seeks to equitably subordinate claims that the Defendants have filed against the Debtors. The Amended Complaint notes that the Defendants have filed a number of claims against the Debtors on various grounds, including administrative and priority claims, indemnity claims, litigation claims and tax related claims. (Am. Compl. ¶124.)

The Defendants move to dismiss Count Five for failing to assert specific factual allegations in support of the claim, such as failing to identify an "allowed claim" that is subject to equitable subordination or the inequitable conduct underlying the claim. The Trustee replies that Count Five is based on the inequitable conduct as set forth throughout the detailed factual allegations in the Amended Complaint. Further, the Trustee argues that, although the Defendants' claims are not yet "allowed claims," the Court should consider the equitable subordination claim as part of this adversary proceeding since the Trustee's claims in Count Five arise out of the same facts and circumstances as the Trustee's other claims.

Bankruptcy Code §510(c) provides that the Court, after notice and a hearing, may equitably subordinate all or part of an *allowed* claim to all or part of any other *allowed* claim. 11 U.S.C. §510(c) (emphasis added).

> In the Bankruptcy Code, "claim" is a term of art. It is defined as a "right to payment" or "right to an equitable remedy." 11 U.S.C. § 101(5). Similarly, "allowed" is a term of art, referring to the Bankruptcy Court's determination that a claim is valid and in line for distribution. See 11 U.S.C. § 502. The concept of an "allowed claim" lies at the heart of the bankruptcy process, for only those who possess allowed claims are entitled to distribution from the bankruptcy estate. *In re Johns*, 37 F.3d 1021, 1023 n. 1 (3d Cir.1994) ("An 'allowed claim' is one that will serve as the basis for distribution.").

*In re Insilco Tech., Inc.*, 480 F.3d 212, 216 (3d Cir. 2007). A claim will be considered allowed unless a party in interest objects. 11 U.S.C. § 502(a). *See also In re Frascella Enterprises, Inc.*, 360 B.R. 435, 457 (Bankr. E.D. Pa. 2007) ("Section 502(a) states that a claim is deemed allowed unless a party in interest objects.").

The Trustee has not identified the claims which he seeks to subordinate. Objections have been filed to the Defendants' administrative and priority claims and, accordingly, they are not allowed claims. The inference arising from the broad allegations in the Amended Complaint is that the Court should consider subordination of any and all claims submitted by the Defendants,

whether allowed or not. Some courts have held that a determination about equitable subordination may be made *prior* to a determination of whether a claim is allowed.  *In re Mid-American Waste Systems, Inc.,* 284 B.R. 53, 68 (Bankr.D.Del. 2002) citing *United States Abatement Corp. v. Mobile Exploration & Producing U.S., Inc. (In the Matter of United States Abatement Corp.),* 39 F.3d 556, 560 (5th Cir. 1994) (finding no requirement that a bankruptcy court address the merits of a pending claim prior to disposing of a motion for equitable subordination).  However, under the circumstances in this bankruptcy case, Count Five is too vague and too broad. Count Five will be dismissed, without prejudice, so that the Trustee is not prevented from raising equitable subordination in connection with the claims objections.

## CONCLUSION

For the reasons set forth above, the Motion to Dismiss will be granted, in part, as follows: (i) Count One (Breach of Fiduciary Duty) and Count Two (Aiding and Abetting Breach of Fiduciary Duty) of the Amended Complaint will be dismissed; (ii) Count Three (Breach of Contract) of the Amended Complaint will be dismissed as to any breach of contract claim based upon contracts other than the Identified Agreements; (iii) Count Four (Breach of the Implied Covenant of Good Faith and Fair Dealing) will be dismissed as to any claims for breach of the implied covenant based on contracts other than the Identified Agreements; and (iv) Count Five (Equitable Subordination) will be dismissed, without prejudice.

The Motion to Dismiss will be denied, in part, as follows: (i) Count Three (Breach of Contract), will not be dismissed with respect to the breach of contract claims based upon the Identified Agreements; and (ii) Count Four (Breach of the Implied Covenant of Good Faith and Fair Dealing) will not be dismissed with respect to claims based upon the Identified Agreements.

An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated:  November 25, 2014