UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : |
| | : Chapter 11 |
| TROPICANA ENTERTAINMENT, LLC, et al.,[1] | : |
| | : Case No. 08-10856 (KJC) |
| Debtors. | : (Jointly Administered) |
| | : |
| | |
| LIGHTSWAY LITIGATION SERVICES, LLC, | : |
| as TRUSTEE of TROPICANA LITIGATION | : |
| TRUST. | : |
| Plaintiffs, | : |
| v. | : Adv. Proc. No. 10-50289 (KJC) |
| | : (D.I. 193) |
| WILLIAM J. YUNG, | : |
| WIMAR TAHOE CORP., f/k/a TROPICANA | : |
| CASINO and RESORTS, INC., and | : |
| COLUMBIA SUSSEX CORPORATION, | : |
| Defendants. | : |

**MEMORANDUM OPINION DENYING
MOTION FOR SUMMARY JUDGMENT**

**BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

---

[1] On May 5, 2008, Tropicana Entertainment LLC and the following related entities filed chapter 11 petitions in this Court: Adamar Garage Corporation; Adamar of Nevada Corporation; Argosy of Louisiana, Inc.; Atlantic-Deauville, Inc.; Aztar Corporation; Aztar Development Corporation; Aztar Indiana Gaming Company, LLC; Aztar Indiana Gaming Corporation; Aztar Missouri Gaming Corporation; Aztar Riverboat Holding Company, LLC; Catfish Queen Partnership in Commendam; Centroplex Centre Convention Hotel, L.L.C.; Columbia Properties Laughlin, LLC; Columbia Properties Tahoe, LLC; Columbia Properties Vicksburg, LLC; CP Baton Rouge Casino, LLC; CP Laughlin Realty, LLC; Hotel Ramada of Nevada Corporation; Jazz Enterprises, Inc.; JMBS Casino LLC; Ramada New Jersey Holdings Corporation; Ramada New Jersey, Inc.; St. Louis Riverboat Entertainment, Inc.; Tahoe Horizon, LLC; Tropicana Development Company, LLC; Tropicana Enterprises; Tropicana Entertainment Holdings, LLC; Tropicana Entertainment Intermediate Holdings, LLC; Tropicana Express, Inc.; Tropicana Finance Corp.; Tropicana Las Vegas Holdings, LLC; Tropicana Las Vegas Resort and Casino, LLC; and Tropicana Real Estate Company, LLC (collectively, the "Debtors"). On May 6, 2008, this Court entered an Order Directing Joint Administration of Cases. *See* D.I. 49.

Citations herein to the main bankruptcy case docket will be referred to as "D.I. #" and citations to the adversary proceeding docket will be referred to as "Adv. D.I. #."

The Defendants in this adversary proceeding, Wimar Tahoe Corporation ("Wimar") and Columbia Sussex Corporation ("Columbia"), move for summary judgment in their favor on the remaining claims in the First Amended Complaint, arguing, in short, that discovery has not provided sufficient facts to support those claims. The Plaintiff, Lightsway Litigation Services, LLC (the "Trustee"), objects to the Defendants' summary judgment motion, asserting that the complexity of this case, supported by a fulsome record (including more than thirty depositions, ten volumes of testimony before the New Jersey Casino Control Commission, extensive expert witness reports, and thousands of documents[2]) necessitates a trial to resolve the open issues of fact and law. Upon further review of the record, the Defendants' motion for summary judgment will be denied.

## BACKGROUND[3]

On May 5, 2008, Tropicana Entertainment LLC and several related entities filed chapter 11 bankruptcy petitions in this Court. The Debtors were affiliated hotels and casinos located in Nevada, Mississippi, New Jersey, Indiana and Louisiana. On May 6, 2008, an ad hoc consortium of senior subordinated noteholders filed an emergency motion for appointment of a chapter 11 trustee to replace William J. Yung, III ("Yung"), who was the director, chief executive, and 100% owner of all equity securities of Tropicana Casino and Resorts, Inc.,[4] the Debtors' ultimate parent company (the "Chapter 11 Trustee Motion"). On July 2, 2008, the Court entered an Order approving the parties' resolution of the Chapter 11 Trustee Motion which, *inter alia*, provided for

---

[2] Plaintiff's Answering Brief (Adv. D.I. 197) ("Ans. Br.") at 19-20.
[3] The background information on this matter is taken, in part, from my prior opinion on the Defendant's Motion to Dismiss the Amended Complaint (the "Motion to Dismiss") (Adv. D.I. 29). *See Lightsway Litig. Serv. LLC v. Yung (In re Tropicana Entm't, LLC)*, 520 B.R. 455 (Bankr. D. Del. 2014) (the "*Tropicana I*"). More details about the allegations in the Complaint can be found in *Tropicana I*.
[4] In 1990, Yung incorporated Wimar Tahoe Corporation ("Wimar"), which was later renamed Tropicana Casinos and Resorts, Inc. ("TCR"). After the Debtors filed bankruptcy, TCR changed its name back to Wimar. *Tropicana I*, 520 B.R. at 461 n.2.

2

Yung's resignation from the board of Debtor, Tropicana Entertainment Holdings, LLC, and all other Debtors.[5]

On May 5, 2009, the Court entered Orders confirming the First Amended Joint Plan of Reorganization of Tropicana Entertainment LLC and Certain of its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code (the "OpCo Plan"), and the First Amended Joint Plan of Reorganization of Tropicana Las Vegas Holdings, LLC and Certain of its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code (the "LandCo Plan").[6] The Plans created a Litigation Trust to pursue certain "Insider Causes of Action" for the benefit of certain classes of unsecured creditors. Lightsway Litigation Services, LLC was appointed as the trustee of the Litigation Trust.

On February 17, 2010, the Trustee commenced the adversary proceeding by filing a complaint against Yung, Wimar, Columbia, and others asserting claims for breach of fiduciary obligations, breach of contract, breach of the implied covenant of fair dealing, and equitable subordination. The Court granted the motion to dismiss the original complaint, but allowed the Trustee to file an amended complaint. On February 9, 2011, the Trustee filed the First Amended Complaint (the "Complaint") against Yung, Wimar and Columbia.[7] The Complaint asserted five claims: (i) breach of fiduciary obligations; (ii) aiding and abetting breach of fiduciary obligations; (iii) breach of contract; (iv) breach of the covenant of good faith and fair dealing; and (v) equitable subordination. The Court granted, in part, the Defendants' motion to dismiss the Complaint by dismissing counts (i), (ii) and (v).

---

[5] D.I. 485.
[6] D.I.s 2001, 2002. The OpCo Plan and the LandCo Plan may be referred to together as the "Plans."
[7] Adv. D.I. 44.

3

The parties engaged in discovery regarding the two remaining counts in the Complaint: breach of contract and breach of the covenant of good faith and fair dealing.[8] The parties also participated in mediation twice, without success. Trial was scheduled and rescheduled. Then, on December 18, 2018, the Defendants filed the motion for summary judgment. The Trustee filed a response, objecting to summary judgment and, after the Defendants filed a reply, a notice of completion of briefing was filed on March 13, 2019. On April 5, 2019, the Court entered an Order postponing trial and scheduling oral argument on the motion for summary judgment. Oral argument was heard on May 15, 2019.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). Pursuant to *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, the claims fall within the confines of post-confirmation related-to jurisdiction, since there is a close nexus between the claims and the bankruptcy plan, which granted authority to the Trustee to pursue the Insider Causes of Action.[9] The claims for breach of contract and breach of the covenant of good faith and fair

---

[8] Pursuant to the *Tropicana I* decision, the breach of contract and breach of covenant claims are limited to the eight management contracts attached to the Complaint (the "Management Agreements"). The Defendants also ask the Court to limit trial to their management of the three properties discussed in the Trustee's expert's report. I do not agree that the trial should be so limited.

[9] *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154- 168-69 (3d Cir. 2004), in which the Court wrote that:
> [T]he jurisdiction of the non-Article III bankruptcy courts is limited after confirmation of a plan. But where there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate.

4

dealing may not be core claims, but the parties have consented to this Court's entry of a final order on non-core matters.[10]

## STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[11] At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.[12]

The moving party bears the burden of establishing the absence of a genuine dispute as to a material fact.[13] "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."[14] When the nonmoving party bears the burden of persuasion at trial, the moving party "may meet its burden . . . by showing that the nonmoving party's evidence is insufficient to carry that burden."[15]

---

[10] *Tropicana I*, 520 B.R. at 463. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 191 L.Ed. 2d 911 (2015).
[11] Fed. R. Civ. P. 56(a).
[12] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
[13] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 2552-53 91 L.Ed.2d 265 (1986)
[14] *Id.*, 477 U.S. at 323, 106 S.Ct. at 2553.
[15] *Foulk v. Donjon Marine Co., Inc.*, 144 F.3d 252, 258 n.5 (3d Cir. 1998) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."[16] Summary judgment cannot be avoided by introducing only "a mere scintilla of evidence,"[17] or by relying on "conclusory allegations, improbable inferences and unsupported speculation."[18] "Brash conjecture coupled with earnest hope that something concrete will materialize, is insufficient to block summary judgment."[19]

Substantive law determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit will preclude summary judgment."[20] Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[21] The Court must resolve all doubts and consider the evidence in the light most favorable to the nonmoving party.[22]

## DISCUSSION

(A)     Breach of contract claims

The Defendants argue that the Trustee has failed to articulate the basis for the breach of contract claim - - namely, exactly what each Defendant did wrong and which provisions of the contracts were breached. The Defendants claim that the Trustee's response to their discovery requests was too general. For example, when asked to "specify which provision(s) of the contract

---

[16] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

[17] *Sarko v. Penn-Del Directory Co.*, 968 F.Supp. 1026, 1031 (E.D. Pa. 1997) (citation omitted), *aff'd* 189 F.3d 464 (3d Cir. 1999).

[18] *J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5,8 (1st Cir. 1990)).

[19] *Id.* at 1251 (quoting *Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir. 1993)).

[20] *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

[21] *Id. See also Delta Mills, Inc. v. GMAC Comm. Fin., LLC (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009) (An issue is genuine "when reasonable minds could disagree on the result.").

[22] *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2505 ("[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

6

you claim has/have been breached," the Trustee replied: "all provisions relating to duties and obligations, including the specified services listed in the Exhibits to the respective contracts."[23] When the Defendants "insisted" on a more substantive answer, the Defendants claim the Trustee "responded with a thirty-one page rambling narrative that (i) did nothing more than ape the allegations in the [Complaint], but (ii) did not identify any contractual provisions that Defendants had allegedly breached."[24]

Further, the Defendants assert that neither the Trustee's corporate designee, Jaime D'Almeida, nor the Trustee's liability expert, William Friedman, could provide any better answers at their depositions. Instead, the Defendants argue that Mr. D'Almeida stated only that the Defendants committed "mismanagement," and could not identify specific services that each Defendant (separately) failed to perform, or what issues arose with respect to specific locations or properties. The Defendants also claimed that the Trustee's expert showed complete unfamiliarity with the terms of the Management Agreements.

The Trustee disputes the Defendants' characterization of vague and nonresponsive answers to discovery on the breach of contract claim. Instead, the Trustee asserts that he has cited to substantial evidence to support the claim. The Trustee argues that the Defendants breached the Management Agreements by mismanaging the properties, which is amply supported by documentation, such as the 63-page order issued by the New Jersey Casino Control Commission (the "CCC") explaining its decision to deny renewal of the casino license for Tropicana in Atlantic

---

[23] Plaintiff's Responses to Defendants' First Set of Interrogatories and Document Requests Directed to the Plaintiff, at 2-3, (Defendants' Memorandum in Support of Summary Judgment (Adv. D.I. 194) (the "S.J. Memo"), Ex. 25 (Adv. D.I. 194-9 at 208-09 of 300).

[24] S.J. Mem., at 18; *See also* S.J. Mem., Ex. 27 (Plaintiff's Supplemental Responses to the Defendants' First Set of Interrogatories and Document Requests Directed to the Plaintiff) (Adv. D.I. 194-9).

City.[25] The CCC decision was upheld on appeal by the Superior Court of New Jersey, and then the Supreme Court of New Jersey.[26] The Trustee provides examples of the "Defendants' Overall Gross Mismanagement," by citing to, *inter alia*, his Supplemental Responses to the Defendants' First Set of Interrogatories and Document Requests (the "Supplemental Responses"), which, in turn, is supported by citations to testimony before the CCC, depositions taken in connection with the adversary proceeding, or the declaration submitted by the Debtors in support of their first day motions before this Court.[27] For example, the Supplemental Responses provide details of problems with the New Jersey hotel and casino for noncompliance with New Jersey regulations due to the lack of an independent audit committee, or by removal of mandatory security personnel, plus the impact of drastic reductions in the workforce, which led to the loss of the casino license.

The Trustee also defends its expert witnesses' unfamiliarity with the contracts in their deposition testimony. The Trustee explained that Mr. Friedman was "not retained to offer an opinion on the ultimate issues of whether Defendants breached the [Management] Agreements or the implied covenant of good faith and fair dealing."[28] Instead, Mr. Friedman's expert report states his view of the tasks that fall within the casino management's primary responsibilities, then (based upon his review of the documents and testimony in the litigation) his opinion as to whether the Defendants mismanaged the casino properties by failing to perform those tasks.[29] The Trustee also defends Mr. D'Almeida's deposition testimony, arguing that he should not be faulted for failing to memorize specific contract provisions. Mr. D'Almeida prepared an expert report

---

[25] S.J. Mem., Ex. 18 (Adv. D.I. 194-9).
[26] *Matter of Adamar of New Jersey, Inc.*, 401 N.J. Super. 247, 950 A.2d 231 (N.J. Sup. Ct. App. Div. 2008) *aff'd* 197 N.J. 179 (N.J. Sup. Ct. Nov. 25, 2008).
[27] S.J. Mem., Ex. 27 (Adv. D.I. 194-9).
[28] Ans. Br. at 23.
[29] S.J. Mem., Ex. 12 (Adv. D.I. 194-7).

estimating lost profit damages caused by the Defendants' mismanagement of the Debtors' properties.[30]

Under Delaware law, the elements of a breach of contract claim are (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff.[31] Paragraph 3 in each of the four Wimar contracts attached to the Complaint require Wimar to provide "any and all services in casino management matters required or requested by [the counterparty] in connection with its various casino operations as listed in Exhibit II," which sets forth the following services:

1. Supervision of casino operations including employment matters, staffing, processing of payrolls, marketing and advertising programs, casino layout, casino operations and procedures, gaming equipment and supply purchases and inventory levels, and other matters related to the casino operations.
2. Regulatory oversight and regulatory compliance as it relates to casino operations and internal audit procedure and operation.
3. Financing matters including financial reporting, borrowing funds, investing excess funds, and other financial matters related to the casino operations.[32]

In accordance with the standard for summary judgment, I have reviewed the documentation submitted by the parties in the light most favorable to the Trustee, including the agreements, depositions, answers to interrogatories, testimony before the CCC, the CCC decision (as well as those by the Superior Court and Supreme Court of New Jersey), and expert reports. The Trustee provides ample support to demonstrate that there is a genuine issue of material fact regarding whether Wimar breached its obligations to supervise casino operations and provide regulatory oversight and compliance in connection with the casinos, as described in the Wimar Contracts.

---

[30] S.J. Mem. Ex. 11 (Adv. D.I. 194-7).
[31] *J.R. Simplot Co. v. Nestle USA, Inc.*, 2009 WL 564194 (D. Idaho Mar. 4, 2009) (applying Delaware law) (citing *H-M Wexford LLC v. Encorp. Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003)).
[32] Complaint, Exs. A, B, C, D (the "Wimar Contracts"), ¶ 3; Ex. II.

The contracts with Columbia that were attached to the Complaint require Columbia to provide "accounting and business management services" to hotels and casinos "upon the terms and conditions hereinafter set forth."[33] The Columbia Contracts are similar to each other, but not identical. However, each contract includes a paragraph 3 titled: "Duties." The version found in the Columbia Contracts with Aztar Corporation[34] and with Wimar OpCo, LLC[35] states:

> During the term of this Agreement, CSC [Columbia] shall provide to [Aztar or Wimar] any and all services in accounting and tax matters required or requested by [Aztar or Wimar] in connection with [Aztar or Wimar] and its subsidiaries' various hotel operations and shall also provide certain accounts payable and payroll services for the related casino operations, including, without limitation, the services specified in Exhibit II. Within the limitations herein provided, CSC will render such other services of a supervisory nature in the financial area of the applicable hotel and specific casino operations as may be requested from time-to-time by [Aztar or Wimar] without further compensation than that for which provision is made in this Agreement.[36]

Each of the Columbia Contracts attaches a similar Exhibit II, which provides:

Services

Hotel Operations:

1. Maintenance of general ledger and preparation of monthly financial statements.
2. Approval and processing of vendor invoices for payment and preparation of various accounts payable reports.
3. Approval and processing of payroll including payment of wages, withholdings, payroll taxes and benefits, and preparation of various payroll reports and tax returns.

---

[33] Complaint, Exs. E, F, G, H, (the "Columbia Contracts"), ¶ 1.

[34] Complaint, Ex. E Under the Columbia/Aztar Contract, Columbia was providing services to Ramada New Jersey Holdings Corporation (Tropicana Atlantic City); Adamar of Nevada (Tropicana Las Vegas); Ramada Express, Inc. (Ramada Express) and Aztar Indiana Gaming Company, LLC (Casino Aztar Evansville). *Id.*, Exhibit I.

[35] Complaint, Ex. F. Under the Columbia/Wimar OpCo Contract, Columbia was providing services to CP Baton Rouge Casino, LLC (Belle of Baton Rouge Casino and Sheraton Baton Rouge); Columbia Properties Laughlin, LLC (River Palms); Tahoe Horizon, LLC (Lake Tahoe Horizon Casino Resort); and Columbia Properties Tahoe, LLC (Mont Bleu). *Id.*, Ex. I.

[36] Complaint, Ex. E and Ex. F, ¶ 3. *See also* Complaint, Ex. G and Ex. H, ¶ 3.

4. Maintain cash position; reconcile bank accounts and preparation of various reports.
5. Supervise operation of hotel including employment decisions, purchasing services and products, and sales and marketing decisions.
6. Monitor accounts receivable billings and collection.

Casino Operations:

1. Process approved vendor invoices including coding invoices, entering invoices in accounts payable system, processing payments to vendors and preparation of various accounts payable reports and computer files.
2. Process approved payroll including entering hours, new hires, terminations, pay rate changes and withholdings, preparation of payroll checks, payment of withholdings, garnishments, payroll taxes, and benefits, and preparation of various reports and computer files.

Combined Operations:

1. Prepare consolidated balance sheet, income statement and cash flow statement at the end of each quarter for submission to bank.
2. Prepare bank covenant compliance report each quarter.[37]

The Defendants argue that Columbia had limited responsibilities for the casinos that were unrelated to management, and, further, they argue that Columbia was not a party to the New Jersey casino licensing proceeding. However, the Columbia Contracts required Columbia to "supervise operation of hotel[s], including employment decisions, purchasing services and products, and sales and marketing decisions."[38] While much of the Complaint's focus is on the casino operations, the casino properties also include a hotel, and the allegations of mismanagement involve both. The documents provided in connection with the summary judgment motion raise issues of fact regarding the impact on the Debtors of allegedly insufficient staffing at both the hotels and casinos,[39] or allegedly failing to update or refurbish hotel rooms.[40]

---

[37] The Columbia Contracts, Ex. II.
[38] *Id.*
[39] *See, e.g.,* S.J. Mem. Ex. 27, at 10-12.
[40] *Id.,* at 18, 21-22. The Defendants also argue that summary judgment should be entered in their favor because the Debtors' expert witness failed to establish that the actions of Wimar and Columbia *caused* the Debtors to suffer damages. Whether the downfall of the Debtors was due to the Defendants' breach of

11

For these reasons, the Defendants' request for summary judgment on the breach of contract claims will be denied.

(B)   <u>Breach of the implied covenant of good faith and fair dealing claims</u>

As discussed in *Tropicana I*, Delaware courts have discussed claims for breach of the implied covenant of good faith and fair dealing:

> The implied covenant of good faith and fair dealing inheres in every contract and "requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." The implied covenant cannot be invoked to override the express terms of the contract. Moreover, rather than constituting a free floating duty imposed on a contracting party, the implied covenant can only be used conservatively "to ensure the parties' 'reasonable expectations' are fulfilled." Thus, to state a claim for breach of the implied covenant, [the plaintiff] "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." General allegations of bad faith conduct are not sufficient. Rather, the plaintiff must allege a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff the fruits of the contract. Consistent with its narrow purpose, the implied covenant is only rarely invoked successfully.[41]

The Defendants request entry of judgment in their favor on the Trustee's claim for breach of the implied covenant of good faith and fair dealing. The Defendants argue that the Trustee's claim does not comport with Delaware law because it: (i) fails to specify an implied contractual obligation that was violated; (ii) duplicates the breach of contract claim; and (iii) generally alleges bad faith.

In this case, as is often the case in bankruptcy litigation, the Trustee is stepping into the shoes of those Debtor entities that entered into the Wimar Contracts and the Columbia Contracts.

---

contract or due to other factors - - such as the economy or competition as suggested by the Defendants - - is also a material issue of fact to be determined at trial.

[41] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del.Ch. 2009) (citations omitted).

The question is whether the expectations of the applicable Debtor entities under the Management Agreements were thwarted by the allegedly arbitrary or unreasonable actions of Wimar and Columbia. The Trustee claims that Wimar and Columbia, acting through Yung, managed the casinos and hotels in a way that destroyed their value. The Trustee argues that the express contractual duties to supervise the hotel and casino operations also imply that the Defendants should, among other things: (a) comply with state and local regulations; (b) maintain amicable relationships with labor unions and local communities; (c) reasonably allocate expenses between the hotel and casino properties; (d) retain revenue-producing programs; and (e) properly maintain the properties.

> Stated in its most general terms, the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. Thus, parties are liable for breaching the covenant of the contract by taking advantage of their position to control implementation of the agreement's terms. The Court has recognized the occasional necessity of implying contract terms to ensure the parties' reasonable expectations are fulfilled. This quasi-reformation, however, should be [a] rare and fact-intensive exercise governed solely by issues of compelling fairness.[42]

The Trustee's claim does not duplicate the breach of contract claim. Instead, it raises an issue of material fact as to whether the Defendants performed the supervisory and management duties in good faith within the justifiable expectations of the Debtors. The Defendants request for summary judgment on this claim will be denied.

---

[42] *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (citations and internal punctuation omitted).

13

## CONCLUSION

For the reasons set forth herein the Defendants' Motion for Summary Judgment will be denied. An appropriate Order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated  May 29, 2019