**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| TROPICANA ENTERTAINMENT, LLC, | ) | |
| et al., | ) | |
| | ) | Case No. 08-10856(MFW) |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| LIGHTSWAY LITIGATION SERVICES, LLC | ) | |
| as TRUSTEE of TROPICANA LITIGATION | ) | |
| TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Adv. No. 10-50289 (MFW) |
| WIMAR TAHOE CORPORATION f/k/a | ) | |
| TROPICANA CASINOS AND RESORTS, INC. | ) | |
| and COLUMBIA SUSSEX CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>AMENDED OPINION</u>[1]

Before the Court is the Complaint filed by the Trustee of
the Tropicana Litigation Trust (the "Plaintiff") against Wimar
Tahoe Corporation ("Wimar") and Columbia Sussex Corporation
("Columbia") (collectively the "Defendants").  After several pre-
trial motions and decisions which narrowed the scope of the
Complaint, a ten-day trial was held on the remaining claims for
breach of contract and breach of the covenant of good faith and
fair dealing.  Because the Court concludes that the Plaintiff has

---

[1]     This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure.

failed to prove its claims (or any damages), the Court will enter judgment in favor of the Defendants.

I.    BACKGROUND

William J. Yung, III, founded Columbia in 1972.[2]  Over the next twenty years, Columbia acquired a portfolio of more than 70 hotels, many in the "upscale full-service" and "resort" segments.[3]  In 1990, Mr. Yung created Wimar to purchase, develop, and operate casino properties, which by 2006 totaled seven.[4]  On May 19, 2006, Wimar entered into an agreement to acquire all the outstanding stock of Aztar Corporation ("Aztar").[5]  On January 3, 2007, the deal closed and Wimar acquired Aztar for approximately $2.1 billion in cash.[6]

After the acquisition, each of the casino and hotel entities acquired from Aztar entered into separate service agreements (the

---

[2]    Joint Stipulation of Facts, Adv. D.I. 281 at ¶ 6.  Citations to the docket in the adversary proceeding are to "Adv. D.I. #," citations to the record in the main case are to "D.I. #," and citations to the exhibits are to "TX #."

[3]    Id.

[4]    Id. at ¶ 7.

[5]    Id. at ¶ 8.

[6]    Id.  On closing, Aztar (and, inter alia, its five casino properties) became wholly-owned indirect subsidiaries of Wimar. Id. at ¶ 9.  One of the casinos was sold shortly after the acquisition, leaving Wimar managing eleven casinos.  Id. at ¶¶ 7 & 8 n.3.

"Service Contracts") with Wimar and Columbia for the management of the casinos and the management of the hotels, respectively.[7] The Wimar Service Contracts provided for "any and all services in casino management matters . . . in connection with [the] various casino operations" along with "other services of a supervisory nature in the casino operations."[8] Wimar's specific duties under the contracts were: (1) casino supervision including employment, staffing, payroll, marketing, casino layout, casino operations, and gaming equipment, (2) regulatory oversight and compliance, and (3) financial reporting, borrowing, and investing.[9] The Columbia Service Contracts provided for "services in account and tax matters . . . in connection with Aztar and its subsidiaries' various hotel operations and shall provide certain accounts payable services for the related casino operations."[10] The specific duties outlined in the Columbia Service Agreements were: (1) for the hotels: (a) maintain the general ledger, (b) prepare financial statements, (c) process vendor invoices, (d) prepare accounts payable reports, (e) process payroll, (f) monitor and

---

[7]    Id. at ¶¶ 11 & 12.  Historically, Mr. Yung had always separated the management of the hotels at his casino properties from the casino management.  Tr. 12/12/2022 at 21:2-6; Tr. 11/7/2022 at 93:14-23.

[8]    TX 36 at ¶ 3; TX 37 at ¶ 3; TX 38 at ¶ 3; TX 39 at ¶ 3.

[9]    Adv. D.I. 281 at ¶ 11.

[10]    Id. at ¶ 12.  See also TX 40-43.

3

reconcile bank accounts, (g) supervise hotel decisions including employment, purchasing, sales, and marketing, and (h) monitor accounts receivable, billings, collections; (2) for the casinos: (a) process invoices and payments to vendors, (b) prepare accounts payable reports and files, and (c) process payroll; and (3) for the combined operations: (a) prepare balance sheets, income statements, and cash flow statements, (b) prepare bank covenant compliance calculations, and (c) obtain insurance.[11]

Wimar began operating the Tropicana Atlantic City casino ("Trop AC") on January 3, 2007, after it was granted an interim casino license in the summer of 2006.[12] Wimar sought the renewal of Trop AC's casino license and issuance of a plenary casino license.[13] The Division of Gaming Enforcement (the "DGE") investigated and on October 30, 2007, recommended approving the renewal and issuance of a plenary license subject to certain conditions.[14] On December 12, 2007, after eight days of hearings, the New Jersey Casino Control Commission (the "CCC") denied the request for renewal of Trop AC's license and issuance

---

[11]     Id.

[12]     Adv. D.I. 281 at ¶ 16.

[13]     Id.

[14]     Id. at ¶ 17.

of a plenary license.[15]

Five months later, on May 5, 2008, Tropicana Entertainment, LLC, and its affiliates (the "Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code.[16] The Debtors were affiliated entities owning hotels and casinos located in Nevada, Mississippi, New Jersey, Indiana and Louisiana. Mr. Yung was the director, chief executive, and 100% owner of all the equity securities of Tropicana Casino and Resorts, Inc., the Debtors' ultimate parent company. On May 5, 2009, the Court confirmed the First Amended Joint Plan of Reorganization (the "Plan") of Tropicana Entertainment LLC and certain Debtors related to it.[17] The Plan created the Litigation Trust to pursue enumerated "Insider Causes of Action" for the benefit of certain classes of unsecured creditors.[18]

On February 17, 2010, the Plaintiff filed the Complaint against Mr. Yung, Wimar, Columbia, and others asserting claims for breach of fiduciary obligations, breach of contract, breach

---

[15] Id. at ¶ 18. The CCC decision was appealed and affirmed. In re Adamar of New Jersey, Inc., 401 N.J. Super. 247, 251 (N.J. Super. Ct. App. Div.), aff'd, 197 N.J. 179, 180 (N.J. 2008).

[16] Adv. D.I. 281 at ¶ 3.

[17] D.I. 2001 & 1995. A separate Plan was confirmed that same day for Tropicana Las Vegas Holdings, LLC and certain related Debtors. D.I. 2002 & 1994.

[18] D.I. 1995 at Art. IV.B.5.

of the implied covenant of good faith and fair dealing, and equitable subordination.  After decisions on two motions to dismiss and a motion for summary judgment, two claims remained against Wimar and Columbia only: (1) breach of contract and (2) breach of the covenant of good faith and fair dealing.  Those claims are based on the four Service Contracts between Wimar and the Debtors for casino management services and the four Service Contracts between Columbia and the Debtors for hotel management and back-office functions.

The Court held a ten-day trial on the remaining claims in October, November and December, 2022.  Simultaneous post-trial proposed findings of fact and conclusions of law were filed by the parties on April 21, 2023.  The matter is ripe for decision.

## II.  <u>JURISDICTION</u>

The Court has jurisdiction over this adversary proceeding because there is a close nexus between the claims and the confirmed Plan.[19]  The parties have stipulated to the Court's

---

[19]    28 U.S.C. § 157(a).  <u>Lightsway Litig. Servs., LLC v. Yung (In re Tropicana Ent., LLC)</u>, 520 B.R. 455, 462 (Bankr. D. Del. 2014) (concluding that "[t]he claims fall within the confines of post-confirmation related-to jurisdiction" over which the Court has subject matter jurisdiction) (citing <u>Binder v. Pricewaterhouse & Co., LLP (In re Resorts Int'l, Inc.)</u>, 372 F.3d 154, 168-69 (3d Cir. 2004).  <u>See also</u> Adv. D.I. 281 at ¶ 4 (stipulating that the Court has subject matter jurisdiction).

authority to enter a final order.[20]


III. <u>DISCUSSION</u>

    A.   <u>Unitary Entity Doctrine</u>

The Plaintiff contends that both Defendants effectively acted as a unitary entity and, therefore, are jointly liable for the damages suffered as a result of each of their actions under the "unitary entity" theory. When the Plaintiff raised this legal argument at trial, the Defendants argued that the Plaintiff's assertion of this novel argument was improper.[21] The Court allowed the Plaintiff to proceed, however, concluding that the Plaintiff was entitled to press any legal argument that the evidence might support.[22]

---

[20] <u>Lightsway Litig. Servs., LLC v. Yung (In re Tropicana Ent., LLC)</u>, Adv. No. 10-50289, 2019 WL 2320810, at *2 (Bankr. D. Del. May 29, 2019) (concluding that the Court had subject matter jurisdiction and the consent of the parties to enter a final order) (citing <u>Wellness Int'l Network, Ltd. v. Sharif</u>, 135 S. Ct. 1932 (2015)). <u>See also</u> 28 U.S.C. § 157(c).

[21] Tr. 10/31/2022 at 43:19-45:13. <u>See, e.g.</u>, <u>Broadcom Corp. v. Qualcomm Inc.</u>, 543 F.3d 683, 694 (Fed. Cir. 2008) (holding that legal theories first presented after trial are waived); <u>Alza Corp. v. Andrx Pharms., LLC</u>, 607 F. Supp. 2d 614, 622 (D. Del. 2009) (striking portions of proposed post-trial findings of fact relating to defense not presented in pretrial briefing or during the trial).

[22] Tr. 10/31/2022 at 43:19-45:13 (allowing Plaintiff leeway to present evidence on the "unitary entity" theory). <u>See</u> Fed. R. Civ. P. 15(b) ("A party may move — at any time, even after judgment — to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not

7

Despite contending at trial that the Defendants were jointly liable under the "unitary entity" doctrine, the Plaintiff failed to present any legal authority to support its theory in its post-trial submission. The Court has only found such a "unitary entity" theory cited in a tax case which is not applicable here.[23] However, the Court has found references to a "single business enterprise" theory of liability, which appears to apply to the actions of sister corporations if factors similar to an alter ego claim against a parent corporation are established.[24]

---

affect the result of the trial of that issue.").

[23] See, e.g., Bausch & Lomb Inc. v. Comm'r of Internal Revenue, 933 F.2d 1084, 1089 (2d Cir. 1991) (citations omitted) (noting that section 482 of the Internal Revenue Code generally treats a parent and its subsidiaries that file a consolidated tax return as individual entities, in contrast to "the unitary entity theory [which] considers all commonly controlled entities as 'parts of the same unitary business,' with the result that 'intercompany transactions cannot produce a real economic profit or loss and must therefore be eliminated from tax consideration.'").

[24] See, e.g., Sante Fe Minerals Inc. v. BEPCO, L.P. (In re 15375 Mem'l Corp.), 382 B.R. 652, 667 (Bankr. D. Del. 2008) (discussing single business enterprise theory under Louisiana law as akin to an alter ego claim); In re Garden Ridge Corp., 338 B.R. 627, 640 (Bankr. D. Del. 2006) (noting that "Texas recognizes the 'single business enterprise doctrine' to prevent an entity from relying upon corporate form to evade an existing debt or legal obligation.") (citing SSP Partners v. Gladstrong Inv. (USA) Corp., 169 S.W.3d 27, 43 (Tex. App. 2005) and Carlson Mfg., Inc. v. Smith, 179 S.W.3d 688, 693-94 (Tex. App. 2002) ("the purpose of the single business enterprise theory, like the alter ego theory and other doctrines designed to pierce the corporate veil, is to prevent an inequitable result.")).

The Plaintiff argues that the evidence supports application of the alter ego doctrine[25] (and unitary entity theory) because Mr. Yung was the ultimate decision maker in control of Wimar, Columbia, and the Debtors.[26] The Plaintiff further asserts that because Columbia performed the financial, human resources and administrative functions,[27] Columbia controlled the purse strings

---

[25] See, e.g., Shandler v. DLJ Merch. Banking, Inc., No. Civ.A. 4797-VCS, 2010 WL 2929654, *15 (Del. Ch. July 26, 2010) (allowing "claims of alter-ego liability to survive where plaintiffs alleged that the boards of a parent company and its subsidiary were identical and one company appeared to operate as an instrumentality of the other, as well as where the officers and directors of two companies were the same, and the two companies shared a common address"). See also Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S & B Holdings LLC), 420 B.R. 112, 135 (Bankr. S.D.N.Y. 2009) (noting that "courts in other contexts, such as collapsing fraudulent conveyance claims, indicate that a bankruptcy court should not elevate form over substance, and have refused to permit the corporate structure to stand in the way of a finding of liability, particularly if the defendant had knowledge of the fraud"); Official Comm. of Unsecured Creditors v. Morgan Stanley & Co. (In re Sunbeam Corp.), 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002) (finding that "Courts have 'collapsed' a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction").

[26] Tr. 12/12/2022 at 52:1-4. See also, Tr. 11/2/2022 at 138:8-13 (Mr. Yung testified "I make the major decisions. I'm responsible for the major decisions, so - but as far as making all the decisions, I probably make - I probably make all the major decisions. But there are a lot of other decisions that I have - don't even know about that are being made, you know.").

[27] Tr. 10/31/2022 at 154:6-21; Tr. 11/1/2022 at 311:25-312:19; Tr. 12/12/2022 at 90:22-91:11; TX 54, 55 & 56.

of the Debtors.[28]  Consequently, it asserts that the corporate veil should be pierced to allow a judgment against each Defendant for the other's actions.

The Defendants respond that there is no evidence that supports piercing the corporate veil or treating them as one entity.  They note that each Defendant was a separate corporation with its own separate Service Contract with the Debtors.[29]  They argue that, unlike tort claims,[30] the Plaintiff's breach of contract claims require proof of the liability of each Defendant for breach of its respective contract and a factual basis for allocating the alleged damages to the specific services each Defendant allegedly failed to perform.[31]

---

[28]     The Plaintiff contends that its argument is also supported by the fact that the CCC concluded that Columbia had to be approved as an "entity qualifier" for Trop AC.  TX 151 at 54.  See also  TX 186 at 10 (the DGE found that "[Trop AC] is affiliated with Columbia . . . and [Trop AC] shares its corporate offices with Columbia . . . as well as many business functions.  Columbia . . . provides [Trop AC] with accounting, tax and business management services.").  The Plaintiff asserts that the Defendants acknowledged that requirement by advising the DGE that the Service Contracts with Wimar and Columbia would not go into effect until the regulators approved them.  TX 151 at 34.

[29]     Adv. D.I. 281 at ¶ 2; TX 39-43.

[30]     Cf. Campbell v. Robinson, No. 06C-05-176PLA, 2007 WL 1765558, at *2 (Del. Super. Ct. June 19, 2007) (joint and several liability applies to judgment against multiple joint tortfeasors).

[31]     See, e.g., Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009) ("It remains the plaintiff's burden to demonstrate . . . each defendant's liability on each cause of action asserted.");

10

The Court agrees with the Defendants that the evidence does not support a conclusion that they are jointly liable for each others' actions under a unitary entity, single business enterprise, or alter ego theory.  The Third Circuit has held that the separate identities of corporations are to be respected in bankruptcy cases absent compelling equitable circumstances.[32] To pierce the corporate veil, the Third Circuit considers multiple non-exclusive factors, including:

> gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of [sic] debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder.[33]

---

H.Y.C. v. Hyatt Hotels Corp., 319 F.R.D. 136, 139 (D. Del. 2016) ("Liability must be assessed with regard to each [defendant] individually . . . ."); Jo Ann Howard & Assocs., P.C. v. Cassity, 79 F. Supp. 3d 1001, 1020 (E.D. Mo. 2015) (holding that "it is the burden of the Plaintiff to establish which damages were caused by each separate defendant"); Doe v. Exxon Mobil Corp., 573 F. Supp. 2d 16, 30 (D.D.C. 2008) (finding that it is improper to "simply lump[] the . . . Defendants together" when evaluating whether sufficient evidence exists to establish liability against each individual defendant).

[32]   See, e.g., In re LTL Mgmt., LLC, 64 F.4th 84, 105 (3d Cir. 2023) (holding that "separateness is foundational to corporate law, which in turn is a predicate to bankruptcy law [and] not easily ignored") (citing In re Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005) (holding that "the general expectation of state law and of the Bankruptcy Code . . . is that courts respect entity separateness absent compelling circumstances calling equity . . . into play")).

[33]   United States v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981).

The evidence in this case shows that few, if any, of these factors are present. Furthermore, the Third Circuit has held that even if some of the above-cited factors are present, an alter ego claim will not succeed without a showing of fraud.

> Not every disregard of corporate formalities or failure to maintain corporate records justifies piercing the corporate veil. That remedy is available only if it is also shown that a corporation's affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the alter ego's use of its assets for his own benefit in fraud of its creditors. In short, the evidence must show that the corporation's owners abused the legal separation of a corporation from its owners and used the corporation for illegitimate purposes.[34]

The facts presented in this case do not meet that standard. The Defendants were separate legal entities[35] with separate roles in the corporate family: Columbia was responsible for hotel operations and back-office functions while Wimar was responsible for casino operations.[36] This division of responsibility was established by Mr. Yung and his companies many years ago, long

---

[34] Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1521 (3d Cir. 1994).

[35] Adv. D.I. 281 at ¶ 2.

[36] Tr. 10/31/2022 at 26:8-10, 27:3-5, 55:11-17, 65:6-11, 77:2-5, 120:8-120, 124:13-23, 126:7-11, 135:20-21; Tr. 11/1/2022 at 197:11-14, 303:5-14; Tr. 11/7/2022 at 96:5-23; Tr. 12/12/2022 at 25:5-8, 25:16-26:2, 83:11-15, 91:3-11, 103:2-5, 110:2-4, 116:14--117:6.

before the acquisition of the Debtors.[37]  It is further confirmed in the Service Contracts executed by the Debtors with each Defendant, under which each Defendant had distinct obligations.[38]

The Court concludes that the fact that Columbia handled back-office functions for the Wimar casinos[39] is insufficient to establish that Columbia is responsible for any breach by Wimar of Wimar's Service Contracts or that Wimar is responsible for any breach by Columbia of Columbia's Service Contracts.  The formation of a corporation to perform such administrative services for related corporations is a cost-effective and typical practice in the business world.[40]

Further, the Court finds that simply because Mr. Yung was the President of both Wimar and Columbia and made important decisions for the entire corporate family,[41] is insufficient to support the Plaintiff's claim that Columbia and Wimar are liable

---

[37]    Tr. 11/2/2022 at 6:24-7:2, 7:14-16, 8:7-11, 9:23-10:4; Tr. 12/12/2022 at 14:7-10, 15:21-24, 18:22-24, 19:13-21:6, 23:16-23, 85:15-19.  See also Adv. D.I. 281 at ¶¶ 6-9.

[38]    TX 36-43.

[39]    See n.27 supra.

[40]    See, e.g., Burtch v. Opus, LLC (In re Opus East, LLC), 528 B.R. 30, 66 & 84-85 (Bankr. D. Del. 2015) (finding that sharing services provided by a related corporation did not support an alter ego or fraudulent transfer claim where the services provided and the fee charged were reasonably equivalent).

[41]    See n.26 supra.

for each other's actions.  Many corporate families have parents

who are the ultimate decision makers for the enterprise.  Rather

than apply to every such case, piercing the corporate veil is a

difficult case to make and rarely succeeds.[42]

Significantly, the Plaintiff has presented no evidence of

fraud or use of the Defendants to siphon funds from the

Debtors.[43]  The Plaintiff has had more than ample time to develop

and present evidence to support its unitary entity, single

---

[42]    See, e.g., Trustees of Nat. Elevator Indus. Pension, Health
Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 194 (3d Cir. 2003)
(noting that the alter ego theory requires a showing of fraud,
injustice, or unfairness by clear and convincing evidence);
Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc., No. CV 17-
374-LPS, 2018 WL 5109836, at *4 (D. Del. Oct. 18, 2018)
(dismissing alter ego claim because the "presumption of corporate
separateness may only be overcome by a showing of fraud,
injustice, or unfairness."); Opus East, 528 B.R. at 66 (granting
summary judgment for the defendants on an alter ego claim); In re
Maxus Energy Corp., 641 B.R. 467, 557 (Bankr. D. Del. 2022)
(same).

[43]    It appears that the Plaintiff really blames Mr. Yung for all
the Debtors' woes.  However, it did not file any alter ego claim
against him or present any evidence that he diverted funds from
the Debtors or engaged in any other fraudulent activity.
Although the Plaintiff originally sued Mr. Yung for breach of his
fiduciary duties, its claims against him were dismissed more than
eight years ago.  Tropicana Ent., 520 B.R. at 470.  Since that
time the Plaintiff has not sought to amend the complaint to add
claims against Mr. Yung, including any claim against him under a
unitary entity, single enterprise, or alter ego theory.  The
Court concludes that it is too late at this stage to do so.
Whittington v. Dragon Grp., L.L.C., 991 A.2d 1, 8 (Del. 2009)
(holding that an equitable claim may be barred if there was an
unreasonable delay by the plaintiff in bringing the claim and the
delay creates an unfair prejudice to the defendant) (citing Hudak
v. Procek, 806 A.2d 140, 153 (Del. 2002)).

business enterprise, and alter ego claims.  The Court concludes

that it has failed to prove its claims under any of those

theories.  Therefore, the Court will respect the separate

corporate identities of the Defendants and concludes that the

Plaintiff must establish its breach of contract and breach of the

duty of good faith and fair dealing claims as to each individual

Defendant.

B.    Issue Preclusion

The Plaintiff also argues that the Defendants are precluded

from relitigating facts found by the CCC in its Opinion and Order

denying the Trop AC casino license renewal.[44]  The Plaintiff

asserts that decisions of administrative agencies have been given

preclusive effect where the agency has acted in a judicial or

quasi-judicial manner.[45]

For issue preclusion to apply, the following must be

present:

> (1) the identical issue was previously adjudicated; (2)
> the issue was actually litigated; (3) the previous
> determination was necessary to the decision; and (4)
> the party being precluded from relitigating the issue

---

[44]    TX 151.  That decision was rendered after eight days of
hearings entailing dozens of witnesses and hundreds of exhibits.

[45]    See, e.g., Floyd v. Hill (In re Hill), 495 B.R. 646, 669-70
(Bankr. D.N.J. 2013) (noting that "New Jersey courts have on
occasion granted preclusive effect to the fact-finding of
administrative agencies") (citations omitted).

was fully represented in the prior action.[46]
The Trustee argues that, although it was not a party to the pre-bankruptcy CCC proceeding, it acquired claims under the Plan from the Debtor (Trop AC) which was a party to that proceeding and thus, the Plaintiff essentially stands in its shoes.[47]

The Court finds that the Plaintiff is the successor to Trop AC, which was a party to the CCC proceeding. Wimar was also a party to the CCC proceeding and had a full opportunity (and incentive) to litigate the issues related to the casino license application.[48] Although Columbia was not a party to the casino license application, the Court finds that it too participated and had an incentive to litigate the issue of renewal of Trop AC's license because, as part of that proceeding, the regulators found

---

[46] See Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 249 (3d Cir. 2006) (internal citations omitted).

[47] Alternatively, the Plaintiff asserts that it can use issue preclusion offensively against both Defendants because they were parties to the CCC proceeding. See Floyd, 495 B.R. at 669-70 ("issues of fact adversely adjudicated against an original party in a first proceeding may be given preclusive effect in a second proceeding even though the subsequent litigation is brought by a new party"). But see Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 331 (1979) (holding that the Court has broad discretion to deny issue preclusion by a non-party to the original action where (1) the party seeking estoppel could have easily joined the prior action; or (2) estoppel would be unfair to the defendant because, inter alia, it did not have an incentive to fully litigate the issue or had limited procedural opportunities in the first action).

[48] See TX 151 at 3-5, n.3.

16

that it was required by New Jersey law to be an "entity qualifier."[49]

However, the Court concludes that the application of issue preclusion is not appropriate in this case.  The findings of the CCC were relevant to its determination that the actions of the Defendants warranted denial of the issuance of Trop AC's casino license.[50]  The issue before this Court is a different one - whether the actions of the Defendants were a breach of the Service Contracts or the implied covenant of good faith and fair dealing.  While the Court ruled that the DGE report and CCC opinion were admissible,[51] because of the difference in the issue at bar, the Court concluded that any findings or conclusions therein are not preclusive as to the ultimate conclusion to be reached in this adversary proceeding.  As a result, the Court allowed both parties great latitude in presenting evidence in support of their positions.  Specifically, the Court allowed the

---

[49]     Id. at 5; TX 186 at 2 & 20-29 (holding that Columbia must qualify under the New Jersey Casino Control Act).  See, e.g., 5:12-82 c(7) (allowing the CCC to require that related parties who manage or control a casino operator also hold a casino license or be an "entity qualifier").

[50]     TX 151.

[51]     Tr. 11/8/2022 at 84:15-85:20.  See also Adv. D.I. 223 & 245 at 4-9 (in ruling on the Defendants' pre-trial motions in limine, the Court found that the DGE report and CCC opinion were admissible under Rule 803(8) as public records).  See Fed. R. Evid. 803(8)(A)(iii).

Plaintiff and the Defendants to offer into evidence any of the testimony and exhibits presented at the CCC hearings, as well as any additional evidence (by live testimony or exhibits) that they felt was appropriate.

    C.    <u>Breach of Contract and Implied Covenant of Good Faith and Fair Dealing</u>

        1.    <u>Legal Standard</u>

            a.    <u>Breach of Contract</u>

"Under Delaware law,[52] a breach of contract claim has three elements: (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) resultant damages."[53] The party alleging a breach of contract claim has the burden of proving the elements of its claim by a preponderance of the evidence.[54]

---

[52]   <u>Tropicana Ent.</u>, 520 B.R. at 468-69 (in considering a motion to dismiss the complaint, the Court advised that, because the parties focused on Delaware law, it would apply that law unless a party specifically argues that another state's law applies and conflicts with Delaware law). The parties have not made that argument and, therefore, the Court applies Delaware law here.

[53]   <u>Wenske v. Blue Bell Creameries, Inc.</u>, No. CV 2017-0699-JRS, 2018 WL 3337531, at *20 (Del. Ch. July 6, 2018) (citing <u>VLIW Tech., LLC v. Hewlett-Packard Co.</u>, 840 A.2d 606, 612 (Del. 2003)).

[54]   <u>See, e.g.</u>, <u>Air Prod. & Chems., Inc. v. Wiesemann</u>, 237 F. Supp. 3d 192, 213 (D. Del. 2017); <u>VLIW Tech.</u>, 840 A.2d at 612; <u>Patel v. Patel</u>, C.A. No. 07C-07-020 RRC, 2009 WL 427977, at *3 (Del. Super. Ct. Feb. 20, 2009).

　　　　b.　<u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

Under Delaware law, the implied covenant of good faith and fair dealing "'is inherent in all contracts' and ensures that parties do not 'frustrat[e] the fruits of the bargain' by acting 'arbitrarily or unreasonably.'"[55]  Within the implied covenant, "good faith" refers to "faithfulness to the scope, purpose, and terms of the parties' contract" while "fair dealing" requires the parties' conduct to be in harmony with the contract's terms and purpose.[56]  The reasonable expectations are to be measured at the time of contracting, and the implied terms must relate to "developments or contractual gaps that the asserting party pleads neither party anticipated."[57]  The inference of an implied covenant is described as a "cautious enterprise" which is "rarely invoked successfully."[58]

---

[55]　<u>Baldwin v. New Wood Res. LLC</u>, 283 A.3d 1099, 1116 (Del. 2022) (citing <u>Dieckman v. Regency GP LP</u>, 155 A.3d 358, 367 (Del. 2017)).

[56]　<u>Miller v. HCP & Co.</u>, No. 2017-0291-SG, 2018 WL 656378, at *23 (Del. Ch. Feb. 1, 2018) (citing <u>Gerber v. Enter. Prods. Holdings, LLC</u>, 67 A.3d 400, 419 (Del. 2013) (emphasis omitted), <u>overruled on other grounds by</u> <u>Winshall v. Viacom Int'l, Inc.</u>, 76 A.3d 808 (Del. 2013)).

[57]　<u>Miller</u>, 2018 WL 656378, at *22-23 (citing <u>Nemec v. Shrader</u>, 991 A.2d 1120, 1125-26 (Del. 2010)).

[58]　<u>Miller</u>, 2018 WL 656378, at *22 (citing <u>NAMA Holdings</u>, 2014 WL 6436647, at *16).

To establish a breach of the implied covenant of good faith and fair dealing, the Plaintiff must prove the existence of "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[59] Breach of an implied covenant exists when "the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."[60]

### 2. Evidence

#### a. Loss of Trop AC Casino License

To establish that Wimar and Columbia breached their Service Contracts, the Plaintiff relied principally on the fact that, while operated by the Defendants, Trop AC lost its casino license in December, 2007.[61] The Plaintiff asserts that the loss of Trop AC's casino license caused a domino effect negatively impacting the other Debtors which ultimately resulted in their bankruptcy filings and the damages sought in this adversary.[62]

---

[59] Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 888 (Del. Ch. 2009).

[60] Nemec, 991 A.2d at 1126 (citing Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 442 (Del. 2005)).

[61] TX 151.

[62] The loss of Trop AC's casino license immediately affected the Evansville casino license. Tr. 10/31/2022 at 131:7-11 (Mr. Mitchel testified that "[t]he Evansville, Indiana property - property's license was up for renewal in, I believe, March of

The Defendants assert that no express provision of the Service Contracts requires that the Defendants obtain or maintain a casino license for any of the Debtors' casinos.[63]

The Plaintiff argues nonetheless that the Defendants cannot contend, and the Court cannot conclude, that the Service Contracts did not contain an implied duty to maintain an operating license for each of the casinos because otherwise the Debtors would have no businesses to operate and the purpose of the Service Contracts would be frustrated.

The Defendants respond that such a provision cannot be implied in the Service Contracts because the issuance of a casino license was beyond the control of the Defendants and depended on an independent agency, which they contend was influenced in Trop AC's case by factors other than simply the actions of the Defendants. They contend that they would not have agreed, explicitly or implicitly, to guarantee the actions of a third party to renew their casino licenses.

---

2008. And we were advised that the loss of another gaming license would be a factor in determining whether the Indiana Gaming Commission would renew that license."). See also 68 Ind. Admin. Code 2-1-5(c)(7) (requiring that any applicant for a casino license must present evidence that it meets the standards to be issued a casino owner's license, including whether the applicant or its owner has had a gaming or other license revoked, suspended, restricted, terminated or denied).

[63] TX 36-43.

The Court agrees with the Defendants. The Service Contracts do not contain an express requirement to obtain or maintain a casino license. Nor can such a blanket requirement be implied. It would not be reasonable to assume that the Defendants would agree to such a provision which would in essence guarantee something beyond their control: the issuance of a license by a third party, independent government agency.

### b. Defendants' Actions

The Plaintiff does not rely solely on the bare fact that Trop AC's application for a casino license was denied but on the reasons the CCC denied renewal. The Plaintiff offered into evidence much of the testimony and exhibits which were presented before the CCC which it contends proves the Defendants' mismanagement of Trop AC.[64] The Plaintiff asserts that this evidence is ample support for their argument that the actions taken by the Defendants caused the loss of Trop AC's casino license and were a breach of their duties under the Service Contracts. Specifically, the Plaintiff presented evidence that the license application was denied by the CCC because the Defendants (1) had failed to form an independent audit committee as required by casino regulations and (2) had made excessive

---

[64] See, e.g., Tr. 10/31/2022 at 36:14-37:13, 244:22; Tr. 11/1/2022 at 287:8, 13:16-25. See also TX 151 at 12-13, 37-38, 40, 42-43; TX 186 at 18-19, 23-27.

layoffs resulting in diminished services and security.[65]

The Defendants concede that Trop AC lost its casino license but assert that the loss of the license was not the result of actions by Wimar or Columbia, which it contends were reasonable and intended to improve the performance of the Debtors. Instead, they argue that the loss of the license was caused by actions of the local hotel service workers union which was upset by the staff reductions. Therefore, the Defendants contend that the loss of the casino license is not alone evidence of a breach of the Service Contracts between the Defendants and the Debtors.

### i.   Audit Committee

The Plaintiff relies specifically on the DGE report and the CCC finding that the Defendants failed to create an independent audit committee for Trop AC as required by law.[66] The CCC described Trop AC's management as "callously disregard[ing]" this requirement and having as its goal "a delay in producing an independent committee."[67]

In response to that contention, the Defendants presented evidence of the extensive efforts of Trop AC's management and counsel to form an audit committee satisfactory to the

---

[65]    TX 151 at 42.

[66]    TX 186 at 18; TX 151 at 37-42, 58.

[67]    TX 151 at 37-38 & 42.

regulators.[68]  They presented testimony from their attorneys that the casino regulations contain no deadline by which Trop AC was required to have an independent audit committee and that such committees are typically not formed before a buyer is given an interim license to operate a casino.[69]  They also testified about the extensive discussions they had with the DGE regarding the formation of the audit committee, noting that several rosters of committee members were proposed by them and rejected until the audit committee was ultimately approved by the CCC on June 20, 2007.[70]

---

[68]    See, e.g., Tr. 11/7/2022 at 90:2-7 ("They hired . . . a well-respected regulator from another state to be their in-house . . . counsel and to help lead them through the process.  And then, they hired three of the most well-respected attorneys, regulatory attorneys, in New Jersey.").  There were also many communications between Trop AC and the regulators regarding the formation of the audit committee.  See, e.g., TX 412; TX 428; TX 430; TX 434; TX 439; TX 473; TX 413; TX 445.

[69]    Tr. 11/7/2022 at 107:2-5, 169: 7-17 (Trop AC was never advised by regulators that it was in violation of any regulation for failure to form its audit committee by a specific time); Tr. 12/13/2022 at 22:15-23:2, 29:10-16 (the New Jersey regulators never advised Trop AC of a drop-dead date for the formation of the audit committee, or that it was in violation of regulations for not having formed an audit committee yet).

[70]    Tr. 11/1/2022 at 301:3-5 ("[I]t was just ongoing discussions to make sure that what we came up with was a structure that was acceptable to New Jersey . . . ."); Tr. 11/7/2022 at 89:11-17, 174:17-179:10 (Mr. Michael, Trop AC's outside counsel, described Trop AC's frequent and close contact with the regulators in 2006 and 2007 concerning the formation of the audit committee); Tr. 12/13/2022 at 20:15-36:13 (Ms. More, Trop AC's in-house counsel, testified about the extensive communications between Trop AC attorneys and the regulators and stated that Wimar had no intent

The Court found the testimony of the Defendants' witnesses on this point to be credible. In particular, the testimony of Mr. Michael and Ms. More regarding the diligent efforts made by the Defendants on behalf of Trop AC to get the regulators' approval of the audit committee was most persuasive.[71] Both had been retained to provide expertise in casino regulation and were well-qualified to do so.[72] They described the ongoing efforts they undertook to identify members of the independent audit

---

to avoid or delay forming an audit committee). See also TX 412 (Trop AC letter dated December 28, 2006, to CCC, after temporary license had issued, concerning the proposed makeup and formation of its audit committee); TX 428 (correspondence dated May 3, 2007, between Trop AC and regulators regarding proposed makeup of audit committee); TX 430 (correspondence dated May 15, 2007, regarding formation of audit committee and reporting lines); TX 434 (June 1, 2007, submission of petition from Trop AC to regulators seeking approval of proposed audit committee charter); TX 439 (communication dated June 1, 2007, regarding Trop AC proposal for audit committee); TX 473 (Trop AC submission of amended petition dated June 15, 2007, for approval of audit committee charter); TX 445 (CCC resolution dated June 20, 2007, preliminarily approving Trop AC audit committee).

[71]  Id.

[72]  Mr. Michael was one of the first attorneys to work as a casino regulator for the DGE when gaming was legalized in New Jersey. He had drafted portions of the New Jersey Casino Control Act and was involved in the development, implementation, and enforcement of the New Jersey gaming regulations. Tr. 11/7/2022 at 157:15-24, 158:18-160:9. Ms. More was equally qualified, having served as general counsel to the Illinois Gaming Board for five years, where, among other things, she drafted the rules and regulations governing gaming in that state and spent much of her career as an attorney in the area of gaming, working on both sides of the regulatory and licensing process. Tr. 12/13/2022 at 7:2-9:1, 12:22-13:1.

committee which the regulators would approve.[73] They testified that this process was typical. Mr. Michael testified that there had never been a previous instance where the CCC had denied a casino license after the acquisition of a casino because an independent audit committee was not in place before or promptly after that acquisition.[74] This testimony was not contradicted by any credible evidence presented by the Plaintiff.

Based on the testimony and evidence offered by both parties in support of their positions, the Court concludes that the Defendants acted reasonably in their efforts to create an independent audit committee. While the New Jersey casino regulations do require an independent audit committee for a casino, they do not explicitly state any deadline by which that has to be done.[75] The Defendants relied on experienced casino

---

[73] In fact, there were several different rosters of audit committee members proposed and discussed with the DGE before the final committee was formed and approved by the CCC. See TX 412; TX 428; TX 430; TX 434; TX 439; TX 473; TX 445.

[74] Tr. 11/7/2022 at 179:20-24. See also Tr. 12/13/2022 at 61:20-62:1 (Ms. More testified that "our audit committee had been approved by the DGE and CCC and, at the time, other casinos had the same audit committee structure as we did and in fact, after our license denial, they were all given time to reconstruct their committees. . . .").

[75] N.J.A.C. § 13:69D-1.11 & § 19:45-1.11(c)2. Although the CCC stated that an audit committee had to be in place before the closing on the Aztar sale, it cited no authority for that. TX 151 at 25-32, 36-42. Although the appellate court in affirming the CCC decision, cited to the casino regulations in support, those regulations do not in fact state any deadline by which an

attorneys, who testified that there was no deadline for establishment of an audit committee and that it was not unusual for the audit committee to be formed after an acquisition closed.[76]  Further, because the audit committee required regulatory approval, the Defendants made extensive efforts to get the regulators' approval, exchanging numerous proposals for audit committee membership and providing information requested.[77]  As a result, the DGE and CCC were well aware that no audit committee had been approved by them before the interim casino license was approved and were aware of the efforts undertaken during 2007 to get approval of an audit committee.  Neither asserted that Trop AC was in violation of the casino regulations until the casino

---

audit committee must be formed.  In re Adamar of New Jersey, Inc., 401 N.J. Super. 247, 269 (N.J. Super. Ct. App. Div.) (citing N.J. Admin. Code § 19:45-1.11(c)2 which provides that casinos shall have mandatory departments, including surveillance and internal audit, which are to report to an independent supervisory committee).

[76]    Tr. 11/7/2022 at 107:2-5 (Mr. Morowitz testified that there was no "drop-dead date" for the audit committee), 169:12-17 (Mr. Michael testified that there was no regulation which called for an internal audit committee the day of closing, as there was no "drop-dead date"), 179:20-24 (Mr. Michael had no knowledge of a casino license ever being denied for failure to have an audit committee in place); Tr. 12/13/2022 at 61:20-62:1 (Ms. More testified that the audit committee had been preliminarily approved by the DGE and CCC, and that other casinos had the same structure and were even given time to reconstruct their committees after Trop AC lost its license).

[77]    See n.70 supra.

license renewal process at the end of 2007.[78]  Instead, the CCC

preliminarily approved the Trop AC audit committee on June 20,

2007, without any finding that there had been any improper delay

or effort to avoid complying with casino regulations.[79]

Thus, the Court concludes that the actions taken by Wimar

and Trop AC to form an audit committee acceptable to the

regulators were reasonable.  As a result, the Court cannot

conclude that the manner in which the Defendants acted to form an

independent audit committee was a breach of their Service

Contracts.

### ii.  Staff Reductions

The Plaintiff contended that the Defendants were responsible

for the loss of Trop AC's casino license in large part because of

excessive layoffs of personnel.[80]  They argue that the CCC had

---

[78]    Tr. 11/7/2022 at 89:16-23, 169:7-11; Tr. 12/13/2022 at 22:15-23:2, 29:10-16.  While the DGE did express the need to get an audit committee in place "ASAP" on May 3, 2007, it did not say that Trop AC was violating the regulations by not having done so already.  TX 428.  Less than two months later, Trop AC did in fact have its audit committee in place and approved by the CCC. TX 445 (CCC resolution dated June 20, 2007, preliminarily approving Trop AC audit committee).

[79]    TX 445 (CCC resolution dated June 20, 2007, preliminarily approving Trop AC audit committee).

[80]    The CCC concluded that "[t]he massive layoffs are another factor that inevitably leads to a denial of the applications for re-licensure and plenary qualification."  TX 151 at 42-43.  It found management's decision-making to be seriously flawed, because it first decided how many employees needed to be fired without any "cogent analysis to justify the outcome."  Id. at 43.

concluded that those layoffs resulted in substantially reduced services to the public[81] and in certain instances violated the gaming regulations.[82]  It relied on the DGE Report and the CCC decision, as well as testimony presented at the CCC hearing on the license renewal.[83]

The Plaintiff also argued that the firing of casino hosts at the Trop AC adversely affected its performance.  It argues that,

[81]    TX 151 at 13-14; TX 186 at 32-37.  See also Tr. 10/31/2022 at 290:9-20 (Mr. Reinhardt testified he was aware of cleanliness issues at Trop AC); Tr. 11/1/2022 at 27:24-28:3, 28:5-14 (Mr. Buro testified there was a significant reduction in cleaning staff and that it was "common knowledge - there was an abrupt downturn in cleanliness on the property and things that would affect customers' perception of the property and things that would affect customers' decision to come to property A versus property B").

[82]    Between January and August 31, 2007, the security department had a net loss of 33 employees for an annual total salary savings of approximately $900,000.  TX 151 at 16.  As a result, the CCC found that "there were inadequate security personnel to perform trolley drops and bill changer pickups.  To compensate, [Trop AC] impermissibly removed personnel assigned to mandatory posts to perform drops and pickups, leaving the mandatory posts unattended."  TX 151 at 26-27.  See also TX 186 at 19.  In addition, Trop AC fired locksmiths that the casino regulations required to be in place, resulting in the DGE filing a complaint against Trop AC on October 25, 2007.  Tr. 11/2/22 at 203:2-3; TX 151 at 45; TX 186 at 19.

[83]    TX 186 at 19, 23-37; TX 151 at 42-50.  During the first month after the Aztar acquisition, Trop AC reduced its overall workforce by 206 employees, principally by laying off or firing almost 200 employees.  TX 151 at 12.  By the end of October, 2007, Trop AC had reduced its overall workforce by 897 employees, leaving it with only 80 percent of the work force it had prior to the acquisition.  Id. at 12-13.  See also, Tr. 11/2/2022 at 5:3-120:5, 121:9-165:13.

because hosts cultivate relationships with gamblers, firing them resulted in a loss of revenues realized from those high-roller gamblers.[84]  Finally, it criticized the firing of on-site accounting personnel (who previously had prepared budgets and forecasts for the individual properties) and consolidation of those functions at Columbia.  The Plaintiff asserted that the centralization of that function was disastrous because Columbia's system was not ready to handle the additional workload.[85]  The Plaintiff further faulted Columbia's management because it did not require that any of the individual properties prepare budgets or forecasts.

The Defendants presented evidence to support their assertion that their actions were reasonable.  They presented testimony of the Trop AC casino managers and an expert opining that Trop AC was overstaffed at the time it was acquired and that, consequently, a reduction of staffing levels was necessary.[86]

---

[84]    Tr. 10/31/22 at 149:2-6, 298:6-10; Tr. 11/1/22 at 165:2-11.

[85]    Tr. 10/31/22 at 241:3-7.

[86]    Tr. 11/1/2022 at 65:11-17, 114:25-115:2 (Trop AC's casino manager, Mr. Buro, stated that Trop AC had been overstaffed, so that staffing cuts were needed); Tr. 11/7/2022 at 20:1-5, 41:8-18, 42:7-44:22, 45:13-46:16, 47:25-49:25,  (Defendants' expert, Corey Morowitz testified that Trop AC was overstaffed when Wimar took over which negatively affected its financial performance, noting that in the years before 2007 every casino in Atlantic City, except Trop AC, was cutting staff and that, in the following decade, additional staffing cuts were made by those casinos and concluding that "the labor reductions that [Wimar]

The Defendants contended that at all times they had communicated with the regulators regarding their planned staff cuts at Trop AC.[87] In addition, management at Trop AC had numerous in-person

implemented in Atlantic City were reasonable and required at the time."); Tr. 11/7/2022 at 48:16-49:25, 50:16-51:16, 52:23-53:12 (Mr. Morowitz noted that prior to the acquisition of Trop AC, its revenue and EBITDA per employee were below the average of Atlantic City casinos, while after the staffing cuts were implemented its revenue and EBITDA per employee were above average); Tr. 11/7/2022 at 33:8-19, 35:12-15, 41:12-24, 143:22-24 (Mr. Morowitz opined that the decline in gross revenues after the acquisition was "purely an impact of market forces and a changing economy").

[87]     Tr. 11/1/2022 at 295:14-18 (there were "volumes" or "stacks" of emails between Trop AC and the regulators concerning staffing levels at Trop AC); Tr. 12/13/2022 at 38:11-14 (Wimar and Trop AC kept regulators apprised about staffing changes at Trop AC); Tr. 11/2/2022 at 24:1-12 (Wimar regularly communicated with the regulators in 2007 with respect to staffing changes at Trop AC); Tr. 11/7/2022 at 75:5-7 ("there was a constant stream of information [to the regulators] about what they [Trop AC] were doing and how they were planning on cutting staff"); Tr. 11/7/2022 at 181:5-10 (Trop AC kept regulators apprised of staffing levels); Tr. 11/1/22 at 72:14-18, 295:3-8 (Mr. Buro agreed that "at all times the property complied in full with all the requests of the regulators to be informed in advance of the cuts after you were asked to do so."). See also TX 413 (providing DGE with an analysis of upcoming prospective staff reductions with comparisons to industry standards and industry averages); TX 414 (Trop AC followed up with regulators regarding staffing cuts, providing a rationale for the cuts and indicating whether it was a reduction in force, resignation, or termination for cause); TX 415 (Trop AC communications with regulators regarding staffing levels); TX 416 (continued communications between Trop AC and regulators regarding changes in staffing levels); TX 417 (ongoing communications between Trop AC and New Jersey regulators on staffing levels); TX 418 (same); TX 421 (same); TX 423 (Trop AC self-reporting security staffing issues to regulators); TX 425 (Trop AC advising regulators of anticipated staffing levels); TX 429 (same); TX 427 (communications with regulators regarding staff reductions due to slot machine changes in technology which replaced coins with

meetings with the regulators about proposed staff cuts.[88]  No
cuts were made without the regulators' approval.[89]

The Defendants also contested the Plaintiff's assertions
(and the CCC conclusion) that the staffing cuts adversely
affected Trop AC's casino operations.  Trop AC's casino manager,
Mr. Giannantonio, testified that the number of customer
complaints received by Trop AC during 2007 was "minuscule" and
that the changes made by management post-acquisition improved
customer service.[90]  Furthermore, the Defendants presented

cards); TX 431 (Trop AC advising regulators of anticipated
staffing cuts); TX 433 (proactive Trop AC communications with
regulators regarding staffing cuts); TX 438 (providing
information requested by regulators concerning Trop AC staffing);
TX 441 (advising regulators of anticipated staffing cuts); TX 446
(same); TX 448 (same); TX 450 (Trop AC interaction with the
regulators regarding staffing levels); TX 453 (same); TX 455
(same); TX 457 (Trop AC communications with regulators regarding
proposed staffing changes); TX 485 (communications regarding
meeting with regulators relating to Trop AC staffing levels); TX
486 (Trop AC interaction with the regulators regarding staffing
cuts).

[88]    Tr. 11/1/2022 at 295:19-296:9, 296:20-298:8.

[89]    Tr. 12/12/2022 at 40:7-9, 45:9-10 ("We never made any cuts
unless [the regulators] approved them.").

[90]    Tr. 11/2/2022 at 20:2-4, 20:11-18 (Trop AC ranked 2d or 3d
best casino in Atlantic City in 2007), 21:18-20 ("the service
level at the Tropicana is vastly superior and the cleanliness is
much better than it was when [Wimar] took over"), 63:15-64:3
(there were very few complaints at Trop AC).  See also Tr.
11/8/2022 at 18:8-19:10 (Mr. Giannantonio testified that 90% of
customers who had complained returned to Trop AC); Tr. 11/8/2022
at 45:25-46:1 (Mr. Giannantonio testified that convention
business at Trop AC had 85% repeat clientele in 2007); Tr.
11/2/2022 at 19:16-20:8 (Mr. Yung testified that the issue was

32

evidence to support their contention that the cleanliness issues at Trop AC were caused by local union sabotage not by staff cuts.[91]

After considering the evidence presented, the Court concludes that the actions taken by the Defendants with respect to cutting staff were reasonable and not a violation of their Service Contracts.  First, the Court concludes that the Defendants made a reasonable business judgment to cut staff to

resolved after the maids started to take over work for the cleaners causing the cleaners to come back to work and that the number of complaints was minuscule compared to the number of room stays); Tr. 11/7/2022 at 143:1-6 (Mr. Michael testified that there "were some cleanliness issues, again, that were a result of union callouts and work stoppages.  That wasn't a direct result of staffing cuts.  That was a direct - that was a result of union activity."); Tr. 11/7/2022 at 94:7-16 (Mr. Morowitz testified he had never seen a casino license revoked or denied on the basis of either cleanliness or customer complaints).

[91]     Tr. 11/8/2022 at 68:4-6, 70:25-71:7, 72:24-73:3 (the president of the local union admitted he decided to "go to war" with Trop AC after the staffing cuts and even "hir[ed] a private investigator to basically go to the casino in New Jersey and try to find health violations and other evidence that could be used against the company"); Tr. 12/14/2022 at 40:17-42:1 (the union orchestrated callouts and sabotage to harm Trop AC and Wimar).  See also Tr. 11/2/2022 at 19:12-20:2; Tr. 11/7/2022 at 71:17-18, 72-73; TX 476 (photos showing vandalism); TX 477 (incident report for graffiti and vandalism dated March 14, 2007); TX 478 (incident report on vandalism to the property dated March 20, 2007); TX 479 (incident report on vandalism to the property dated April 16, 2007); TX 480 (incident report of vandalism in the dealers' lounge, to which customers did not have access, dated June 10, 2007); TX 481 (incident report of vandalism in the restroom dated June 18, 2007); TX 476 (picture of vandalism); TX 482 (emails in which Trop AC management discussed ongoing vandalism on March 14, 2007).

improve business performance, because the staffing levels at Trop AC were too high in comparison to other casinos in the industry.[92] While there were some missteps (such as firing casino hosts, security personnel, and locksmiths),[93] they were quickly corrected.[94] Further, the Court finds that the consolidation of accounting personnel at Columbia was also a sound business judgment, resulting in a reduction of staff and costs.[95] The fact that Columbia did not require that budgets be

---

[92]    See n.86 supra.

[93]    Tr. 11/02/2022 at 192:12-18 (Mr. Yung testified that one of the missteps was the fact that the casino manager "laid off, let go the - some of the most productive hosts and then brought in a bunch of his friends that were not productive whatsoever"); Tr. 11/02/2022 at 203:12-19 (Mr. Yung testified that he was not aware of the regulatory requirements for locksmiths when he made the decision to terminate them, but has since learned of that error).

[94]    Tr. 11/2/2022 at 101:10-102:18 (Mr. Yung testified that although 1000 employees were let go, there were 500 new hires for a net loss of 500 employees); Tr. 11/4/2022 at 119:10-15 (Mr. Bratic confirmed that there were workers hired back); Tr. 12/12/2022 at Tr. 73:19-22, 79:13-23 (Mr. Yung testifying to rehires, including slot hosts).

[95]    Tr. 11/1/2022 at 272:2-11 (Mr. Yuhas testified that it could make sense to centralize back-office services, such as accounting, because there are multiple casinos in the company), 303:3-14 (Ms. More testified that the purpose of the management agreements included "in terms of having systems in place that could provide for centralized operations and knowledge that had been gained on the . . . hotel side. And on the Casino side the casino service agreement, you know, kind of the same thing; a reimbursement for managerial services that were being provided to all of [sic] the casinos."); Tr. 11/2/2022 at 156:22-25 (Mr. Yung testified that the usual practice was to centralize many business functions, such as accounting, when there was a joint hotel-casino operation).

prepared by each entity is mitigated by the fact that consolidated reports were prepared as part of the centralized accounting and finance functions.[96]

Second, there is ample evidence that the Defendants kept the regulators constantly apprised of their staffing decisions.[97] Based on that constant dialogue with the regulators, the Court concludes that the Defendants never intended to obfuscate or mislead the regulators about Trop AC staffing levels or to violate casino regulations.[98]

Third, the evidence presented on the cleanliness issue convinces the Court that the problem was not caused by the reduction in cleaning staff but by actions of others to destroy property and cause complaints to be made to the DGE and CCC in retaliation for staffing cuts. For example, the public bathrooms were covered with graffiti criticizing Mr. Yung, toilets had sand poured into them, and similar acts of destruction were

---

[96]    Tr. 10/31/2022 at 154:22-155:13 (Wimar prepared budget and forecasts in connection with some lending agreements); Tr. 10/31/2022 at 283:9-20 (Mr. Reinhardt testified that because of the consolidation of accounting and finance functions, no one felt there was a need to do individual budgets or forecasts).

[97]    See n.87-89 supra.

[98]    Tr. 10/31/2022 at 284:24-284:2; Tr. 11/1/2022 at 298:14-299:4; Tr. 11/1/2022 at 41:4-8; Tr. 11/1/2022 at 114:15-17; Tr. 11/1/2022 at 66:18-21; Tr. 11/1/2022 at 74:8-11; Tr. 11/1/2022 at 74:16-18; Tr. 12/12/2022 at 39:5-9; Tr. 11/2/2022 at 27:8-9; Tr. 12/13/2022 at 19:5-14; Tr. 11/1/2022 at 110:18-20.

documented.[99]  That is hardly evidence of a failure to have enough personnel on staff to keep the bathrooms clean as a result of normal usage.  Further, Trop AC's general manager testified credibly that the public complaints about cleanliness in the rooms were de minimis, not excessive.[100]

Consequently, the Court finds that the decision of the Defendants to cut staff was reasonable and not a breach of their Service Contracts with the Debtors.  Therefore, the Court concludes that the Plaintiff has failed to establish that the Defendants are liable for a breach of the Services Contracts or a breach of the implied covenant of good faith and fair dealing.

That determination might obviate the need for the Court to decide the issue of damages.  However, in the interest of efficiency in the event that a reviewing Court were to disagree with that conclusion, the Court will address whether the Plaintiff has met its burden of proving compensable damages are due from the Defendants.

    2.   Damages

To establish damages, the Plaintiff presented testimony by an expert, Jaime d'Almeida, who opined that the damages suffered

---

[99]   See n.91 supra.

[100]   Tr. 12/14/2022 at 42:19-43:18 (Mr. Giannantonio testified that there were only 66 complaints compared to the 369,000 plus room nights during the time frame in question).

by the Debtors as a result of the Defendants' actions were between $406.4 and $600 million.[101] Mr. d'Almeida relied on both a property level method and a debt pricing method of calculating damages to reach that conclusion.[102] Both methods were used to determine and compare the value of certain of the Debtors on the acquisition date (January 3, 2007) and shortly after the CCC decision denying the Trop AC casino license (December 31, 2007).[103] Mr. d'Almeida contended that the loss of value reflected the impact of the Defendants' mismanagement of the Debtors.

Under the property level method, Mr. d'Almeida analyzed three of the Debtors' properties (Trop AC, Evansville, and Laughlin). He first determined the actual enterprise value of the three casinos and then compared that to the value that he determined they would have had but for the actions of the Defendants. He used both a market approach and a contemporaneous value approach and averaged the two results. Using the property

[101] Tr. 11/3/2022 at 33:22-34:1; Expert Report of Jaime C. d'Almeida at ¶¶ 107 & 108.

[102] Tr. 11/3/2022 at 13:9-11; Expert Report of Jaime C. d'Almeida at ¶¶ 10 & 11.

[103] Mr. d'Almeida employed an <u>ex ante</u> damages analysis, under which nothing that occurred after 2007 could have any bearing on Plaintiff's damages. Tr. 11/3/2022 at 11:23-25. Plaintiff's attorney admitted at trial that the "basis of their claim for damages in this case relates solely to what had transpired during the calendar year 2007." Tr. 10/31/2022 at 70:3-17.

37

level method, Mr. d'Almeida concluded that the value lost by those three properties in 2007 was $406.4 million.[104]  Because those properties only represented 60% of the Debtors' EBITDA, he opined that this was less than the damages actually incurred across all the Debtors' properties.[105]

Under the debt pricing method, Mr. d'Almeida found that the actual price of the Debtors' debt declined by 33.3% in 2007, while the debt of other casinos in the markets where the Debtors operated declined only by 3% and the debt of the entire industry declined only by 10.4%.[106]  Comparing the Debtors' decline of 33.3% with the overall market decline of 10.4%, Mr. d'Almeida concluded that the Debtors lost an additional $219 million in value.[107]  Using that same method, Mr. d'Almeida found that the Debtors also lost between $125 and $335 million in value of its equity for total damages of $344 to $555 million, or an average of $450 million.[108]

---

[104]  Expert Report of Jaime C. d'Almeida at 35-43, Figures 10, 13, & 16.

[105]  Id. at 43.

[106]  Tr. 11/3/2022 at 27:15-28:15, 30:5-21; Expert Report of Jaime C. d'Almeida at Figures 18 & 19.

[107]  Tr. 11/3/2022 at 30:13-31:1; Expert Report of Jaime C. d'Almeida at Figures 20-22.

[108]  Expert Report of Jaime C. d'Almeida at 50-51, Figures 20-22.

The Defendants presented their own expert, Walter Bratic, who testified about substantial deficiencies he found in Mr. d'Almeida's expert analysis.

### a. Lack of Foundation

### i. Assumes Liability

Mr. Bratic first criticized Mr. d'Almeida's reliance on the opinion of the Plaintiff's withdrawn liability expert, William Friedman, to establish liability and causation rather than doing his own analysis of those factors.[109]  Mr. Friedman did not testify, and, therefore, Mr. Bratic opined that there is no basis for Mr. d'Almeida's entire opinion.[110]

The Plaintiff argued that it did not need to present any expert on liability.  Instead, the Plaintiff contended that it had presented sufficient evidence at trial that the Defendants breached the Service Contracts and their implied duty of good faith and fair dealing.

Because the Court found that the Plaintiff did not meet its burden of proving the Defendants' breach of contract or implied duty of good faith and fair dealing, the Court agrees with the Defendants that Mr. d'Almeida's damages opinion lacks an

---

[109]   Tr. 11/3/2022 at 36:10-18, 38:23-20:42.

[110]   Tr. 11/4/2022 at 19-21 (Mr. Bratic stated that "you need to look at causal factors for all of [sic] these companies and that's not something that Mr. d'Almeida did.").

essential foundation.[111]

ii. <u>Assumes Defendants' Actions Solely
Responsible for All Losses</u>

Mr. Bratic also disputed Mr. d'Almeida's conclusion that the
Defendants' management decisions alone were responsible for all
the alleged damages sustained by the Debtors.[112]  Instead, Mr.
Bratic concluded that much of the loss of value and gross
revenues at Trop AC was caused by macro economic factors, such as
the smoking ban in the Atlantic City casinos, the competition
from new casinos in Pennsylvania, and the global recession, which
occurred at that time and adversely affected all Atlantic City
casinos.[113]

---

[111]  <u>See, e.g.</u>, <u>Stecyk v. Bell Helicopter Textron, Inc.</u>, 295 F.3d
408, 414 (3d Cir. 2002) (citations omitted) (acknowledging that
it "is an abuse of discretion to admit expert testimony which is
based on assumptions lacking any factual foundation in the
record" but finding sufficient evidence in the record in that
case to support the expert's conclusion).

[112]  Tr. 11/3/2022 at 15:19-24, 16:8-11, 17:1-237:21-23,
140:24-141:25 (Mr. d'Almeida's property level approach attributed
all Trop AC's loss of market share to mismanagement).  On cross-
examination, however, Mr. d'Almeida admitted that factors other
than mismanagement can affect a casino's performance.  Tr.
11/3/2022 at 163:19-23 (stating that "I don't think that if you
lose market share, that you're mismanaging," and that "things
other than mismanagement can cause market share to go down.").

[113]  Tr. 11/4/2022 at 46:1-3, 62:24-63:12, 68:2-6 (Mr. Bratic
testified that the national economy and, therefore, the casino
market was in decline in 2006 and 2007); Tr. 11/7/2022 at
28:14-29:9; 62:20-63:12 (Mr. Morowitz, testified about the many
factors which impacted the casino market in 2007, including the
national recession caused by the collapse of Lehman Brothers and
other financial institutions).  <u>See also</u> Tr. 11/2/2022 at

40

The Court agrees with Mr. Bratic's conclusion that Mr. d'Almeida's assumption that the Defendants' alleged mismanagement was solely responsible for any loss in value they suffered lacks any basis in Mr. d'Almeida's report and is not supported by the record.

### b.    Improper Methodology

Mr. Bratic also criticized Mr. d'Almeida's opinion testimony because it was based on methods that were not generally accepted or were improperly applied to the facts of this case.

### i.    Debt Pricing Analysis

Mr. Bratic opined that the debt pricing method Mr. d'Almeida utilized is not an established or accepted method for calculating

---

140:14-15, 204:17-19 (Mr. Yung testified that "it wasn't the cuts that negatively impacted the [patronage at Trop AC], it was the sickouts, slowdowns, and the sabotage that affected customers."); Tr. 11/2/2022 at 15:5-12, 55:17-24 (Mr. Yung also testified that the competition from Pennsylvania and the smoking ban adversely affected Trop AC's performance);  Tr. 11/1/2022 at 30:25-31:5 (Mr. Buro testified "First, probably from the impact of the Philadelphia slots and New York slots coming on line [sic] and the smoking ban on top of that, which had its way with the revenue in Atlantic City overall, as we very well know, for five years the market grew at about four to 4.2 percent, and this year the market, it went down."); Tr. 12/14/2022 at 35:21-36:1 (Mr. Giannantonio, who replaced Mr. Buro as Trop AC's casino manager, testified that some of the decline in Trop AC's 2007 revenue was due to the much-needed construction and renovations occurring at Trop AC after the acquisition).  Mr. d'Almeida admitted that the increased competition from new casinos opening nearby could affect casinos and their market shares, differently.  Tr. 11/3/2022 at 143:2-5, 143:23-144:2, 147:3-7.

damages.[114]  Mr. d'Almeida admitted that he (1) had never before used the debt pricing method to calculate damages, (2) could not name any treatise in which the debt pricing method was discussed as a method of calculating damages, and (3) was unaware of any instance in which a court had found the debt pricing method an acceptable damages method.[115]

In addition, Mr. Bratic noted that Mr. d'Almeida's debt pricing analysis again assumed that any change in the pricing of the Debtors' debt or equity was solely the result of mismanagement.[116]  Mr. Bratic concluded that that was a faulty premise because there are many macro economic factors that can affect the pricing of a company's debt and equity, such as market conditions, the national economy, and increased competition in the industry.[117]  Finally, Mr. Bratic testified that Mr.

---

[114]   Mr. Bratic testified that he had provided damages valuations in litigation in over 2,000 cases over more than forty years, but he had never used or heard of anyone using the debt pricing method for calculating damages.  Tr. 11/4/2022 at 93:5-25, 170:4-171:23.

[115]   Tr. 11/3/2022 at 33:5-7, 46:9-20, 47:25-48:3, 51:16-22.

[116]   Tr. 11/4/2022 at 77:11-16.  See also Tr. 11/3/2022 at 27:19-23, 174:21-175:3 (Mr. d'Almeida asserted that any change in debt and equity value was due to mismanagement).

[117]   Tr. 11/4/2022 at 62:24-63:20 (Mr. Bratic testified that there are many factors which can impact debt prices other than mismanagement).  See generally Tr. 11/1/2022 at 30:25-31:5 (Mr. Buro discussed other factors which affect the market other than mismanagement); Tr. 11/2/2022 at 15:5-12 (Mr. Yung discussing the same).

d'Almeida's analysis was also premised on the assumption that debt and equity always move in tandem, when they do not.[118]

Because the Court concludes that the debt pricing analysis used by Mr. d'Almeida was not an accepted methodology for calculating damages and was based on faulty assumptions, the Court concludes that it did not provide a proper basis for his expert opinion on damages.[119]

### ii. Lost Enterprise v. Lost Profits Analysis

Mr. d'Almeida testified that he performed a lost enterprise value analysis rather than a lost profits analysis.[120] Mr. Bratic opined [121] (and Mr. d'Almeida admitted[122]) that a lost profits analysis is the proper measure of damages where value has only been temporarily harmed, while the lost enterprise value analysis is the proper measure of damages where value has been permanently

---

[118]   Tr. 11/3/2022 at 191:1-4.

[119]   Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993) (holding that among the factors that courts must consider in connection with admission of expert evidence is whether the methodology has had general acceptance); Wood v. Showers, 822 Fed. Appx. 122, 124 (3d Cir. 2020) ("The reliability of an expert's conclusions and opinions hinges on the reliability of the expert's methodology."); In re TMI Litig., 911 F. Supp. 775, 803 (M.D. Pa. 1996) (rejecting expert methodology that was not "generally accepted").

[120]   Tr. 11/3/2022 at 55:4-7, 57:3-5.

[121]   Tr. 11/4/2022 at 18:19-24, 19:9-17, 117:7-15, 117:19-22, 140:2-9.

[122]   Tr. 11/3/2022 at 59:20-60:8, 61:10-24.

impaired.  The Debtors' properties were not destroyed, but were only temporarily affected by Trop AC's loss of its casino license.[123]  Had a lost profits analysis been performed, Mr. Bratic opined that it would have shown that the Debtors suffered no damages.[124]

Once again, because the lost enterprise value analysis is not an appropriate method for determining damages where property is only temporarily impaired, as in this case, the Court concludes that it could not provide a proper basis for Mr. d'Almeida's expert opinion on damages.[125]

### iii. Improperly Using an Average

Mr. Bratic also criticized Mr. d'Almeida for averaging different numbers arising from his analyses (contemporary valuation with market valuation and debt pricing with equity pricing) that were wildly disparate.[126]  Mr. Bratic explained that

---

[123]  Tr. 11/3/2022 at 63:8-20 (Mr. d'Almeida admitted that none of the properties he considered were permanently destroyed in 2007); 11/7/2022 at 102:1-13 (Mr. Morowitz confirmed that there was no permanent harm or damage to the casinos).  In fact, most of the Debtors were able to sell their assets as a going concern or successfully emerge from bankruptcy when their Plans of Reorganization were confirmed on May 5, 2009.  See, e.g., D.I. 2001, 2002, 2549.

[124]  Tr. 11/4/2022 at 19:24-20:3.

[125]  Daubert, 509 U.S. at 589; Wood, 822 Fed. Appx. at 124; TMI Litig., 911 F. Supp. at 803.

[126]  Expert Report of Jaime d'Almeida at Figures 10, 13, & 16.

44

this was inappropriate under governing standards without first determining the reason for the disparity and why an equally weighted average is appropriate.[127]

Mr. Bratic alternatively stated that if the Court concludes that it is appropriate for Mr. d'Almeida to average property values, Mr. d'Almeida should have analyzed all the Debtors' properties, instead of just three. Mr. d'Almeida gave no explanation for why he chose the three he did or how they were similar to the others. If all properties had been considered, Mr. Bratic opined that it is entirely possible that an increase in the value of the other properties would have covered any loss of value of the three he analyzed, resulting in no damages.[128]

Similarly, Mr. Bratic criticized Mr. d'Almeida for "normalizing" the Debtors' 2007 EBITDA by applying an EBITDA

---

[127] Tr. 11/4/2022 at 22:23-23:2 (Mr. Bratic testified that Mr. d'Almeida "didn't make an effort to reconcile or explain why he had such different results with two different methodologies, and so these methodologies don't converge"), 23:13-15 (noting there was no reason given why Mr. d'Almeida did a 50/50 average between the two methods of damage calculations), 24:5-31:14 (noting the numbers from the contemporaneous approach utilized by Mr. d'Almeida were based on a five page document with no author or date given), 85:2-86:20 (Mr. Bratic testified that there was no explanation or attempt to reconcile use of values for Trop AC's equity that differed by a factor of three).

[128] Tr. 11/4/2022 at 21:5-14 (noting that Mr. d'Almeida only looked at three of the eight properties, and that "it's very possible that, using his own methodology, the . . . other eight properties could have eclipsed the claimed damages he had for these three properties").

45

margin relying on historical EBITDA data (when the Defendants were not operating the properties) rather than using the actual 2007 EBITDA margin when they were operating the properties.[129] Mr. Bratic explained that the use of a "normalized" EBITDA margin in the "actual" market valuation was not appropriate as none of the generally accepted circumstances warranting its use were present in this case.[130] If Mr. d'Almeida had used the actual EBITDA numbers for 2007, Mr. Bratic concluded that there would be no damages.[131]

### iv. Reliance on Unreliable Information

Mr. Bratic also criticized the reliance by Mr. d'Almeida in doing his contemporaneous valuations on a "five-page document" which (1) did not identify the author or the basis for the valuations, (2) related to the Evansville property - not Trop AC, and (3) was created in 2008, beyond the 2007 ex ante period of

---

[129] Tr. 11/3/2022 at 19:23-20:6, 118:22-23, 119:14-22, 120:7-8, 122:20-21, 123:2-8; Tr. 11/4/2022 at 53:15-25. Mr. Bratic also criticized Mr. d'Almeida for using different EBITDA multiples for his market valuation (11.1) and for his contemporaneous valuation (7.5) without explaining why or doing any analysis to determine what the proper EBITDA multiple should have been for either. Tr. 11/4/2022 at 34:21-35:21; Tr. 11/4/2022 at 56:10-13; 11/4/2022 at 57:20-58:3.

[130] Tr. 11/4/2022 at 98:4 (EBITDA should only be normalized, if at all, for "extraordinary, nonrecurring-type events," none of which was present here).

[131] Tr. 11/4/2022 at 51:4-53:8.

Mr. d'Almeida's analysis.[132]  Consequently, Mr. Bratic stated that Mr. d'Almeida's use of the valuations in the "five-page document" was contrary to established valuation standards.[133]  In addition, Mr. Bratic criticized Mr. d'Almeida for improperly ignoring other contemporaneous valuations of the properties which were higher and would have shown that no damage occurred to the properties.[134]

For all of the above reasons, the Court concludes that Mr. d'Almeida's analysis was based on unreliable assumptions and not based on generally accepted methodologies.[135]  Because Mr. d'Almeida's analysis was the only evidence presented by the Plaintiff on the issue of damages, the Court concludes that the Plaintiff also failed to sustain its burden of proof on that

---

[132]    Tr. 11/3/2022 at 82:4-5, 82:12-13; Tr. 11/4/2022 at 30:9-11; Tr. 11/4/2022 at 37:11-38:6; Tr. 11/3/2022 at 92:4-11, 96:21-24.

[133]    Tr. 11/3/2022 at 100:10-12; Tr. 11/4/2022 at 27:16-23.

[134]    Tr. 11/4/2022 at 42:11-22 (Mr. d'Almeida ignored a valuation of Evansville which showed the property to be worth $80 million more than the one he used), 43:19-44:16 (Mr. d'Almeida used no contemporaneous valuation for Laughlin, ignoring a Laughlin valuation as of December 31, 2007, of $220 million which, if incorporated into Mr. d'Almeida's property level damages analysis for Laughlin, would show no damages); 104:15-21 (criticizing Mr. d'Almeida for using values after December 31, 2007, for Evansville without considering other numbers after that date which showed the property was increasing in value).

[135]    Daubert, 509 U.S. at 589; Wood, 822 Fed. Appx. at 124; TMI Litig., 911 F. Supp. at 803.

element of its breach of contract claim.[136]

IV.  CONCLUSION

For the reasons set forth above, the Court concludes that the Plaintiff has not met its burden of proving a breach of contract or breach of the duty of good faith and fair dealing by the Defendants or the amount of any damages suffered by the Debtors as a result of each of the Defendants' actions. Therefore, judgment will be entered in favor of the Defendants.

An appropriate Order is attached.

Dated: August 21, 2023                    BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

---

[136]  If a breach of contract is established, the plaintiff must establish that its damages are not uncertain or merely speculative and that they were caused by the defendant's breach of contract. See, e.g., Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc., Civ. A. No. 13389, 1996 WL 506906, at *20 (Del. Ch. Sept. 3, 1996) ("Damages cannot be speculative or uncertain . . . but must be at least based on a 'reasonable estimate.'") (citations omitted); AluminumSource, LLC v. LLFlex, LLC, C.A. No.: N18C-07-231 EMD CCLD, 2023 WL2547996, at *20 (Del. Super. Ct. Mar. 16, 2023) (holding that causation is an element of a breach of contract claim); Wise v. W. Union Tel. Co., 181 A. 302, 305-06 (Del. Super. Ct. 1935) (holding that the burden of proof is on the plaintiff to prove damages with reasonable certainty).